# In the United States Court of Federal Claims

No. 09-860L
(Filed April 29, 2011)

```
* * * * * * * * * * * * * * * * * * * * *    *
                                             *
MIKE MEHAFFY,                                *    Takings; denial of application
                                             *    for fill permit pursuant to
                Plaintiff,                   *    section 404 of the Clean Water
                                             *    Act, 33 U.S.C. § 1344 (2006);
         v.                                  *    jurisdiction; ripeness.
                                             *
THE UNITED STATES,                           *
                                             *
                Defendant.                   *
                                             *
* * * * * * * * * * * * * * * * * * * * *    *
```

Bruce B. Tidwell, Little Rock, AR, for plaintiff.

E. Barrett Atwood, San Francisco, CA, with whom was Assistant Attorney General Ignacia S. Moreno, for defendant. Clay Weisenberger, Jennifer Dalton, and Tamar Gerhart, U.S. Army Corps of Engineers, Little Rock, AR, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case is before the court after argument on defendant's Motion To Dismiss, or in the Alternative, for Summary Judgment, pursuant to RCFC 12(b)(1) and 56. Plaintiff claims that the U.S. Army Corps of Engineers (the "Corps") took his riparian property by denying a fill permit application under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (2006). Defendant urges dismissal on grounds that plaintiff's claim is not ripe due to plaintiff's failure to submit a meaningful section 404 permit application upon which the Corps could render a fully informed final decision on its merits. The issue is nuanced because the Corps issued a denial disallowing fill activity, complemented by a thirty-six page Department of the Army Evaluation and Decision Document, therein apprising the landowner of his rights regarding appeal; the landowner appealed; and a final appeals decision issued from the Corps.

**FACTS**

The following facts are taken from defendant's proposed factual findings and plaintiff's responses.  Unless otherwise noted, the facts are uncontested and reflect defendant's formulation.  Thomas Michael Mehaffy ("plaintiff") is a resident of Pulaski County, Arkansas, and the owner of seventy-three acres of riparian land on the Arkansas River in North Little Rock, Arkansas (the "subject property").  Crystal Hill Road borders the north end of the subject property, and the Arkansas River borders its south end; two parcels of land border the subject property to the east and west.

Nomikano, Inc. ("Nomikano"), was an Arkansas corporation that held assets for the benefit of the Mehaffy family.  Nomikano's business was conducted primarily by plaintiff's father, the late Honorable Pat Mehaffy of the United States Court of Appeals for the Eighth Circuit.  Its officers and directors were comprised mostly of Mehaffy family members.

On March 2, 1970, the United States purchased a flowage easement (the "easement") over the subject property from Nomikano.  See PX 1 (Easement Deed, dated Mar. 2, 1970, conveying the easement from Nomikano to defendant (the "Easement Deed")).  Judge Mehaffy negotiated the sale of the Easement Deed to the United States.  The easement was obtained as part of the McClellan-Kerr Arkansas River Navigation System (the "Arkansas River project"), which constructed a series of lock and dams along the Arkansas River.  Obtaining the easement was essential to the Arkansas River project because the project's Lock and Dam No. 7 borders the subject property.

The Easement Deed conveys to the United States the following:

> The perpetual right, power, privilege, and easement is hereby conveyed in, upon, over, and across Tract No. 134E to permanently overflow, flood and submerge the land lying below elevation 249 feet, [mean sea level ("m.s.l.")], and to occasionally overflow, flood, and submerge the land lying above elevation 249 feet, m.s.l., in connection with the operation and maintenance of Lock and Dam No. 7, Arkansas River project, for the purpose authorized by the Act of Congress approved 24 July 1946 (60 Stat. 634), together with all right, title, and interest in and to the timber below elevation 249 feet, m.s.l., and the continuing right to clear and remove any brush, debris, and natural obstructions below said elevation which, in the opinion of the representative of the United States in charge, may be detrimental to the operation of the project; also, including all right, title and interest in the structures and improvements now situate on the land except fencing; provided that no structure for human habitation shall be constructed or maintained on the land;

that no other structure shall be constructed or maintained on the land except as may be approved in writing by the representative of the United States in charge of the project and that no alterations to the contour of the land shall be made without such approval; the above estate is taken subject to existing easements for public roads and highways, public utilities, railroads and pipelines; . . . .

Easement Deed at 1.  The Easement Deed reserved to Nomikano,

its successors and assigns, all such rights and privileges as may be used and enjoyed without interfering with the use of the project for the purposes authorized by Congress or abridging the rights and easement hereby conveyed. Included among rights specifically reserved to the landowner, its successors and assigns, is the right to place fill in the area of said tract and to place structures on said fill above elevation 252 feet, m.s.l.  Notwithstanding, the above exception does not permit the placing of structures for human habitation thereon.

Id. at 1-2.  Plaintiff points to Corps records that are contemporaneous to the conveyance showing that the reservation clause, specifically the right to place fill above elevation 252 m.s.l., "was specifically included in the Easement Deed at the insistence of the Hon. Pat Mehaffy during negotiations."  Pl.'s Resp. to Def.'s Prop. Fact ¶ 8.  For example, a Corps memorandum dated October 2, 1969, regarding "Lock and Dam No. 7, Arkansas River - Tract No. 134E, Counteroffer of Nomikano, Inc.," recites:

During negotiations, and as pointed out in the Negotiator's Report, Judge Pat Mehaffy was insistent that the family corporation be permitted to reserve and fill the area above 249 feet, m.s.l.  It was pointed out to Judge Mehaffy repeatedly that this appeared to be an entirely impractical request in that the cost of placing and compacting fill to this elevation would be exorbitant and that even after the fill was made the area would be subject to inundation . . . .  However, Judge Mehaffy was insistent that this reservation be contained in the option, and in order to obtain possession and in view of the undesirability of a condemnation action, the clause was included in the instrument.

PX 2 at COESP000382.  The flowage easement burdened approximately forty-nine acres of the subject property.  Easement Deed at 4.

Subsequent to the conveyance of the Easement Deed, Congress enacted the Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566 (as amended at 33 U.S.C. §§ 1251-1387 (2006)) (the "CWA"). On October 10, 1980, plaintiff, as representative of Nomikano, was notified that the subject property and Easement Deed were subject to the CWA. DX F (October 10, 1980 letter from Col. Dale K. Randels, P.E., Corps of Engineers District Engineer, to Thomas M. Mehaffy). The letter notified plaintiff that the Easement Deed's clause reserving Nomikano's right to fill was subject to the CWA's section 404 permit requirements:

> Some of the rights reserved to you as the title owner of the subject property are subject to Federal legislation enacted subsequent to 1970 known as the Clean Water Act. A provision found on page 2 of the Easement Deed has to do with the right reserved to you as owner to place fill on the property. Please be advised that Section 404 of the Federal Water Pollution Control Act of 1972 as amended by the same Section of the Clean Water Act of 1977 (33 U.S.C. 1344), and implemented by Federal regulations (33 CFR 323), prescribes a Department of the Army permit as the necessary authorization for the disposal of dredged or fill material into waters of the United States, which includes certain wetlands.

> The definition of wetlands as found in 33 CFR 323 is: "those areas that are inundated or saturated by surface or ground water . . . ." We have observed that there are portions of the property covered by the subject Easement Deed which fit this definition of wetlands.

> Please be advised that the subject Easement Deed for Tract No. 134E is not sufficient to authorize work requiring authorization under the previously mentioned laws and regulation.

Id. On February 18, 1987, Nomikano was dissolved. While Nomikano's business was winding down, its assets were liquidated. As part of the liquidation of Nomikano's assets, the subject property was sold to Mehaffy Construction Company, Inc. ("MCC"), in a negotiated, arms-length transaction for a fair market value of $75,000.00.

Plaintiff formed MCC, along with two sister corporations, to conduct his construction business. Although primarily holding real estate, MCC is engaged in the heavy highway construction business. Plaintiff ran the construction business until he passed control of day-to-day operations to his son, Pat Mehaffy. On May 9, 2000, MCC transferred the subject property to plaintiff for consideration of $10.00.

In 2001 the Corps conducted a wetlands delineation on the subject property. DX J at COEAR000157 (Corps letter to plaintiff dated Oct. 4, 2001). The Corps identified approximately forty-three acres of wetlands. Most of the uplands of the subject property—land that is not identified as wetlands, see PX 4 at 38 (Deposition of Timothy Scott, Sept. 16, 2010, Senior Project Manager, Corps of Engineers, Little Rock District)—are located on the northern end of the subject property, along the Crystal Hill Road frontage. Some of the uplands are located in the southern end of the subject property, interspersed between areas of delineated wetlands.

In 2004 the Mehaffys coordinated with the Corps a project to clear and level a portion of the uplands of the subject property. At Pat Mehaffy's request, the Corps identified the wetlands delineated area. The Mehaffys proceeded to clear and level approximately nine or ten acres, or approximately half, of the uplands portion of the subject property. The Mehaffys use a portion of this cleared area as a storage yard for their construction businesses.

On September 5, 2006, plaintiff submitted to the Corps a section 404 permit application. See PX 5 at COEAR000124-25 (Application for Department of the Army Permit, submitted by MCC). Plaintiff's application sought to fill approximately forty-eight acres of wetlands on the subject property. See id. Plaintiff provided minimal information in completing the application. For example, plaintiff's response to item 18 of the application, the "Nature of Activity" description, was "[f]ill in property above elevation 252 m.s.l." Id. at COEAR000125. In response to item 19, "Project Purpose," plaintiff provided, "[r]ight granted to us in 1970 Easement." Id. Similarly, plaintiff's submission for item 20, "Reasons for Discharge," was "[f]ill in area above elevation 252 m.s.l." Id. Plaintiff listed only "Sand, shale and dirt" in his response to item 21, which requests the "Type(s) of Material Being Discharged and the Amount of Each Type in Cubic Yards." Id. Plaintiff stated that "48 acres" was the total acreage of surface area of wetlands to be filled. Id.

On September 25, 2006, the Corps responded to plaintiff's application by letter requesting additional information. PX 6 at COEAR000120-21 (letter from Mr. Scott to plaintiff dated Sept. 25, 2006, stating that "[b]efore we can process a Department of the Army permit for your request, we have determined that additional information is necessary prior to processing your request"). Specifically, the Corps requested that plaintiff submit (1) a narrative of the purpose of the project; (2) a location map and any plan or profile drawings for the proposed development; and (3) any potential alternative sites or project designs that would avoid or minimize any wetland impacts. Id. at COEAR000120. The letter informed plaintiff that "[o]ne major concern that would be raised during the evaluation process would be, [whether] there [are] any potential alternatives available to you to accomplish your same objectives without impacting wetlands?" Id. The letter advised further that

[p]ursuant to the Code of Federal Regulations (40 CFR 230) Section 404(b)(1) Guidelines, alternatives to placing fill in wetlands that will achieve the same basic purpose of the project, are presumed to be available unless clearly demonstrated otherwise. . . . [B]efore a permit could be issued, it must be demonstrated that there are no practicable alternatives to the project that are less environmentally damaging and that would achieve the same basic purpose of the project.

Id. at COEAR000121-22.

On November 28, 2006, plaintiff responded to the Corps's request with a one-page letter. Plaintiff reiterated that the purpose of the project was to fill the property pursuant to the Easement Deed. He added that some of the property would be used to store construction equipment. Plaintiff's plan was to fill the property with a slope from elevation 260 feet m.s.l. to elevation 253 feet m.s.l. Plaintiff did not provide any alternative sites or additional details, plans, or designs. See DX M. Plaintiff contends that, while "no additional drawings or plans were included" in his letter, "the letter did provide a narrative of [a] proposed purpose of the project, a location map and information about the amount of fill being proposed as requested by the Corps of Engineers." Pl.'s Resp. to Def.'s Prop. Fact ¶ 21 (citing Scott Dep. at 42-44).

According to Mr. Scott, upon receipt of plaintiff's November 28, 2006 letter, the Corps considered plaintiff's application complete and issued a public notice pursuant to the applicable regulations, which provide that "[a]n application will be determined to be complete when sufficient information is received to issue a public notice. The issuance of a public notice will not be delayed to obtain information necessary to evaluate an application." 33 C.F.R. § 325.1(d)(9) (2006) (citations omitted); see Scott Dep. at 44-45, 67.

On December 21, 2006, the Corps published a public notice regarding plaintiff's application that set forth a twenty-five day period for public comments to expire on January 15, 2007. See PX 8 (Application No. 12619-2, Joint Public Notice, Corps of Engineers – State of Arkansas, dated Dec. 21, 2006). Various federal, state, and local agencies, including, *inter alia*, the United States Environmental Protection Agency (the "EPA"), the United States Fish and Wildlife Service ("USF&WS"), the United States Federal Emergency Management Agency ("FEMA"), the City of North Little Rock and Pulaski County floodplain manager, the Arkansas Wildlife Federation ("AWF"), and the Arkansas Department of Environmental Quality, along with other public organizations and individuals, responded with comments. These comments, summarized in a February 15, 2007 letter from the Corps to plaintiff, PX 9 at COEAR000076-81, expressed concerns about the project's potential impact on federal wetlands, the water quality of the Arkansas River, wildlife, and fisheries, see id. The comments also emphasized that plaintiff's application lacked sufficient

development details or information regarding the proposed site configuration. <u>See</u> <u>id.</u> Alternative development suggestions were provided, including the use of riparian buffers, hay bales, sediment screens and filters, and water diversion devises. Other comments set forth concerns about increased flooding and requested that flood and hydraulic studies, as well as other engineering certifications, be performed. The Corps summarized "several reoccurring concerns expressed in the comment letters," <u>id.</u> at COEAR000080, as follows:

> 1) the potential for project alternatives that could avoid or minimize wetland impacts; 2) the loss of high quality forested wetlands and both wildlife and fisheries habitat and the need for adequate compensation; 3) [t]he cumulative impacts regarding the loss of wetlands, waterfowl and fisheries habitat and flood storage along the Arkansas River drainage basin; [and] 4) the loss of flood storage and the potential for flood damage.

<u>Id.</u>

In addition to summarizing the comments received from the public notice, the Corps's February 15, 2007 letter to plaintiff expressed the Corps's concerns following its review of plaintiff's section 404 application. The Corps "reiterated the 404(b)(1) Guidelines' requirement for demonstrating that there are no practicable alternatives to the project that are less environmentally damaging" that would achieve the project's basic purpose. Def.'s Prop. Fact ¶ 23. Specifically, the Corps's letter advised, as follows:

> Accordingly, in order to properly address requirements of the 404(b)(1) Guidelines, additional information regarding practicable alternatives to the placement of the fill material in wetlands should be provided to this office. An alternative is considered practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

PX 9 at COEAR000076. The letter further memorialized the Corps's concern about the project's planned "placement of fill within a designated floodway." <u>Id.</u> Plaintiff was requested to "determine and quantify his impacts to the 1% annual flood event, as well as lesser flood events, and verify that the proposed project does not increase flood heights." <u>Id.</u> at COEAR000077. The Corps recommended that plaintiff retain a consultant to complete a hydraulic study. Among the Corps's other expressed concerns was the project's potential detrimental impact on river flows, and plaintiff was informed that his "project work should be coordinated with the Corps Hydraulics Section before the project could be permitted." <u>Id.</u> The Corps requested that plaintiff "provide a more detailed construction plan, layout, and precise project boundaries of the proposed development." <u>Id.</u>

The Corps concluded by giving plaintiff "the opportunity to review these letters [received following the public notice] and submit your views and rebuttals." Id. at COEAR000080.  However, the Corps noted that if plaintiff did not respond, "we will proceed with a decision on your request." Id.  Plaintiff responded via a one-page letter dated February 21, 2007, stating in full, as follows:

> I received your letter dated February 15, 2007.  I understand the concerns that the various agencies and individuals have.  However, I do not believe that any of them were made aware of our existing easement deed.  We were granted the specific right to fill this property.  There is no mention of having to get approval of any other State or Federal agency.  There is no mention of having to get alternate property, mitigation or hydraulic studies or anything else.
>
> We are simply asking for the right that was specifically granted to us. It appears that your are trying to deny us that right.  I believe that you must honor your commitment in our easement deed.

DX O.  Following receipt of plaintiff's letter, Mr. Scott telephoned plaintiff on February 23, 2007, to discuss his application.  According to Mr. Scott's notes of the telephone conversation, Mr. Scott

> asked [plaintiff] if that was his complete response to the [public] comments. [Plaintiff] said that was all he had and didn't think he had to answer those comments, because the Corps had told him in the past that he could fill the area. . . . I told [plaintiff] I was just checking if he had any more response before I made a final decision.  I told [plaintiff] that I needed that additional information but could go on with what I had.  I once again told [plaintiff] that [the Corps] had responded back in the 1980's with a letter addressing his issues and that a 404 permit would be needed.  He said he had seen it.

PX 10 (Conversation Record dated Feb. 23, 2007, signed by Mr. Scott).  Plaintiff neither provided any further information nor acted on the various recommendations provided by the Corps, including providing alternative plans for the project.  The Corps did not inform plaintiff that the Corps could deem his application withdrawn if plaintiff did not provide all additional information requested by the Corps.

By letter to plaintiff dated August 30, 2007, the Corps denied plaintiff's section 404 application.  See DX B (the "Denial Letter").  Accompanying the Denial Letter was the Department of the Army Permit Evaluation and Decision Document, see id. (the "Decision

Document"), a thirty-three page document that represented a "complete discussion of the factors upon which the [Corps's] denial [was] based." Denial Letter at COEAR000008. The Denial Letter explained that the Corps had "determined that the fill activity does not comply with the Environmental Protection Agency's (EPA) Section 404(b)(1) Guidelines," which disallow such activities if there are practical alternatives that do not have adverse environmental consequences. See id. (citing 33 C.F.R. § 320.4(a)(1) (1986) (explaining that Corps of Engineers section 404 permit will be denied if discharge activity violates EPA section 404(b)(1) Guidelines)). The Denial Letter highlighted the project's potential adverse environmental impact and, in part, identified in the public comments plaintiff's failure to respond to the Corps's requests for additional details regarding the project's design, purpose, and possible alternative designs. See id. at COEAR000008-09. The letter also informed plaintiff of his right to appeal the determination administratively. See id. at COEAR000009 ("Please read the attached Notification of Appeal Process (NAP). You have the opportunity to appeal this permit decision by filing a Request for Appeal (RFA) as described in the NAP.").

The lengthy and comprehensive Decision Document incorporated the public comments received and the Corps's responses. See generally Decision Doc. at COEAR000011-46. The Corps's responses reveal its agreement with the numerous environmental concerns raised. See, e.g., id. at COEAR000013-14 (responding to EPA's comments, Corps stated that "[t]he placement of 230,000 cubic yards of fill within a designated floodway of a major navigable river, and within a high quality forested wetland, requires detailed information in order for the Corps to adequately evaluate the project" and noted that plaintiff "has not made any attempt to demonstrate that the project may or may not have any practicable alternatives [that] would have less adverse environmental impacts to the aquatic ecosystem"); id. at COEAR000016 (noting in response to FEMA comments that plaintiff failed to provide information regarding the project's impact on floodplains, as required by FEMA and City of North Little Rock); id. at COEAR000022 (stating that plaintiff provided "[i]nadequate information" for Corps "to thoroughly evaluate his project" in light of comments received from AWF). In discussing alternative plans, the Decision Document explained that, in spite of the fact that plaintiff did not provide available alternatives, "alternatives were evaluated from a more general perspective" by the Corps. Id. at COEAR000040. The Decision Document then proceeds to set forth the various alternatives to the proposed project that the Corps evaluated. Id.

Subsequently, plaintiff appealed the denial of his permit application through the Corps's administrative appeal process. By letter dated April 15, 2008, the Corps notified plaintiff that "the final administrative appeals decision by the Corps Division Commanding Officer, Brigadier General Kendall P. Cox, has been completed," denying plaintiff's appeal. PX 13 (letter from Col. Donald E. Jackson, Jr., District Commander, U.S. Army Corps of

Engineers, Little Rock District, dated Apr. 15, 2008).  Col. Jackson's letter denominated the determination as a "final decision" by the Corps.  Id.

On December 14, 2009, plaintiff filed a complaint in the United States Court of Federal Claims, which defendant answered on February 26, 2010.  By order entered on April 19, 2010, the court adopted the parties' discovery schedule, and fact discovery commenced.  On January 18, 2011, defendant filed its instant motion to dismiss and alternative motion for summary judgment.  Notably, defendant did not set forth an argument in support of a motion addressed to the merits of plaintiff's claim.  Briefing on defendant's jurisdictional motion was concluded on March 10, 2011.

## DISCUSSION

I.  Standards for jurisdiction

1.  Subject matter jurisdiction pursuant to RCFC 12(b)(1)

Defendant levies the objection that plaintiff's asserted claims are outside the court's jurisdiction.  Jurisdiction must be established before the court may proceed to the merits of a case.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).  Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction.  Renne v. Geary, 501 U.S. 312, 316 (1991); DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction.").  Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); accord M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

When the movant challenges jurisdiction pursuant to RCFC 12(b)(1) upon the facial sufficiency of the pleadings, the court will accept as true a plaintiff's undisputed allegations of fact, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Reynolds, 846 F.2d at 747, and indulge "all reasonable inferences" in favor of the non-movant, Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (holding courts are obligated "to draw all reasonable inferences in plaintiff's favor").  Nevertheless, when the RCFC 12(b)(1) motion controverts the plaintiff's jurisdictional allegations and challenges the factual basis of the court's jurisdiction, only unchallenged

facts are deemed to be correct and true, <u>Hamlet v. United States</u>, 873 F.2d 1414, 1416 (Fed. Cir. 1989), and the plaintiff cannot rely merely on allegations in the complaint, but instead must bring forth relevant competent proof to establish jurisdiction, <u>McNutt v. Gen. Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936); <u>Cedars-Sinai Med. Ctr. v. Watkins</u>, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

In deciding a RCFC 12(b)(1) motion under these circumstances, the court may conduct fact-finding, <u>Moyer v. United States</u>, 190 F.3d 1314, 1318 (Fed. Cir. 1999), and may consider "evidentiary matters outside the pleadings," <u>Indium Corp. of Am. v. Semi-Alloys, Inc.</u>, 781 F.2d 879, 884 (Fed. Cir. 1985); <u>accord</u> <u>Cedars-Sinai Med. Ctr.</u>, 11 F.3d at 1584 (permitting review of "evidence extrinsic to the pleadings, including affidavits and deposition testimony"); <u>see also</u> <u>Rocovich v. United States</u>, 933 F.2d 991, 993 (Fed. Cir. 1991) ("In determining whether a motion to dismiss [for lack of subject matter jurisdiction] should be granted, the [court] may find it necessary to inquire into jurisdictional facts that are disputed."); <u>Reynolds</u>, 846 F.2d at 747 ("If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the . . . court may consider relevant evidence in order to resolve the factual dispute."). Thus, in the case at bar, the parties are authorized to introduce, and this court is authorized to examine, evidence beyond the pleadings in order to resolve the disputed jurisdictional facts.

Defendant's proposed findings and plaintiff's response establish agreement on the salient jurisdictional facts, the implications thereof remaining hotly contested.

2. <u>Ripeness</u>

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" <u>Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 807-08 (2003) (quoting <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967)). Ripeness limitations are "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." <u>Reno v. Catholic Soc. Servs., Inc.</u>, 509 U.S. 43, 58 n.18 (1993). When a court holds a claim to be unripe, it essentially is refusing to exercise jurisdiction over the case. <u>See</u> <u>id.</u>

The touchstone of the ripeness doctrine in regulatory takings is finality of agency decisions. The United States Supreme Court has held, "a takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the

regulations to the property at issue.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985)). Usually, if a landowner has the option to submit a permit, he is required to do so in order to ripen his takings claim, because implicit in the permit system is the possibility that the Government will grant the landowner permission to do with the property as he wishes. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985). A decision denying a permit application is "final when the applicant has no appeal mechanism available and the denial is based on an unchanging fact." Cooley v. United States, 324 F.3d 1297, 1302 (Fed. Cir. 2003).

"This 'finality' requirement is compelled by the nature of the takings inquiry. Evaluating whether the regulations effect a taking requires knowing to a reasonable degree of certainty what limitations the agency will, pursuant to the regulations, place on the property." Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (citing MacDonald, Sommer & Frates v. Cnty. of Yolo, 477 U.S. 340, 350-51 (1986)). As the Supreme Court has cautioned, it is "important to bear in mind the purpose that the final decision requirement serves," Palazzolo, 533 U.S. at 622, because the court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes," MacDonald, 477 U.S. at 348. "While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." Palazzolo, 533 U.S. at 620. Thus, in order for plaintiff to show that his regulatory takings claim is ripe, plaintiff must satisfy a two-pronged inquiry: he must present the court with a final agency decision, and the decision must "demonstrate the extent to which use of the subject property will be allowed under the applicable regulations." Bailey v. United States, 78 Fed. Cl. 239, 252 (2007).

II.  Effect of the Corps's Decision Letter, accompanying Decision Document, and administrative denial of appeal

1.  The parties' interpretations of the Decision Document's legal sufficiency

Defendant rejects plaintiff's regulatory takings claim on ripeness grounds. The thrust of defendant's argument is that plaintiff failed to "submit to the Corps sufficient information in a meaningful permit application," Def.'s Br. filed Jan. 18, 2011, at 14, thereby precluding "the Corps from exercising its expertise in applying the Section 404 regulatory framework," id. at 19. Defendant points to the Corps's numerous—and undisputed—requests to plaintiff for additional information as evidence of the application's deficiency. See id. at 14-15.

Defendant identifies the numerous disregarded requests by the Corps, the EPA, the USF&WS, and Arkansas state and local agencies that plaintiff provide sufficient information to determine whether plaintiff's project would adversely affect the floodplain of the Arkansas River, a determination with which the Corps is charged under Executive Order 11,988, 42 Fed. Reg. 26,951 (May 24, 1977). See Decision Doc. at COEAR000013-16. For this reason the Corps requested plaintiff to conduct a hydraulic study because, "[a]bsent a hydraulic study, the Corps could not determine whether Plaintiff's project would run afoul of Executive Order 11988." Def.'s Br. filed Jan. 18, 2011, at 14-15. Defendant charges that, due to plaintiff's refusal to conduct any studies or provide any alternative analysis, the Corps was unable to satisfy the section 404(b)(1) Guidelines, which require the Corps "to make factual determinations regarding numerous issues such as individual and cumulative impacts on water flows, potential for contamination, environmental effects. . . . [And] require that the Corps determine whether there are any practicable alternatives to the proposed project." Id. at 15 (citing 40 C.F.R. §§ 230.10(a), 230.11).

As a consequence of plaintiff's failure to conduct an alternative analysis, "the Corps had no adequate basis to exercise its regulatory discretion so that the extent of the development restriction on the Subject Property could be known." Id. Further, defendant postulates that "no evidence can be presented to this Court to demonstrate the extent to which the Subject Property's development is restricted," id., either by the CWA or by potential limitations on the amount of fill which may be placed in the floodplain, thereby rendering plaintiff's claim unripe as a matter of law.

Plaintiff counters that the facts amply demonstrate that on April 15, 2008, the Corps issued a final administrative decision on plaintiff's section 404 permit application, thereby satisfying the regulatory requirement that he exhaust all administrative remedies prior to filing his claim. See Pl.'s Br. filed Feb. 15, 2011, at 3. Plaintiff further contends that the Decision Document makes clear that the Corps construes the section 404(b)(1) Guidelines as effectively prohibiting any commercial development on plaintiff's wetlands, thereby rendering his takings claim ripe for judicial review.

The court begins its analysis by determining whether, pursuant to its regulations, the Corps issued a final decision.

2. Regulatory framework

33 C.F.R. § 325 governs the procedures for the issuance or denial of Department of the Army permit applications, including section 404 permits. Section 325.1, which sets forth the application requirements, provides an inclusive list of substantive items that are expected to be included in the contents of an application, including:

13

a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice (detailed engineering plans and specifications are not required); the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies for the work, including all approvals received or denials already made.

33 C.F.R. § 325.1(d)(1). The regulations require an applicant to provide additional information if it is required by the district engineer, including environmental data and alternative "methods and sites" that "may be necessary for the preparation of the required environmental documentation." Id. § 325.1(e). However, this requirement is limited to "only such additional information as the district engineer deems essential to make a public interest determination." Id.

Before the Corps issues its decision on an application, it must release the application to "all interested parties of the proposed activity" in order to "solicit[] comments and information necessary" for the Corps to "evaluate the probable impact on the public interest." Id. § 325.3(a). The public notice must "include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." Id. The regulations deem a permit application complete "when sufficient information is received to issue a public notice." Id. § 325.1(d)(9). However, the "issuance of a public notice will not be delayed to obtain information necessary to evaluate an application." Id.

Section 325.2 sets forth the requirements that the Corps follows when processing permit applications, including a strict timetable for issuing the public notice and evaluating an application that ensures the timely resolution of permit applications. The Corps has fifteen days from receipt of an application to determine its completeness and to issue a public notice, or, if an application is determined to be incomplete, to request any additional information from the applicant. See id. § 325.2(a)(1) ("When an application for a permit is received the district engineer shall . . . . [R]eview the application for completeness, and if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information necessary for further proceeding."); id. § 325.2(a)(2) ("Within 15 days of receipt of an application the district engineer will either determine that the application is complete and issue a public notice . . . or that it is incomplete and notify the applicant of the information necessary for a complete application." (citation omitted)); see also id. § 325.2(d)(1) (requiring issuance of public notice within fifteen days of receipt of "all information required to be submitted by the applicant." (citation omitted)).

Simultaneous with and not sequentially after the public notice and comment period, the regulations afford the Corps a sixty-day window upon receipt of a complete application to make a merits determination. See id. § 325.2(d)(3). The applicable regulation anticipates certain delays, providing a list of six specific events that operate to suspend the accrual period. Once the issue prompting a delay is resolved, the accrual period resumes from the point of suspension. Section 325.2(d)(3) provides, as follows:

> District engineers will decide on all applications not later than 60 days after receipt of a complete application, unless (i) precluded as a matter of law or procedures required by law (see below),
>
>      . . . .
>
> (iv) A timely submittal of information or comments is not received from the applicant,
> (v) The processing is suspended at the request of the applicant, or
> (vi) Information needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period. Once the cause for preventing the decision from being made within the normal 60-day period has been satisfied or eliminated, the 60-day clock will start running again from where it was suspended.

Id.

The requirements of the CWA, among other federal and state laws, are mentioned explicitly as containing procedures that may delay the Corps's evaluation of applications. See id. § 325.2(d)(3)(vi) ("Certain laws (e.g., the Clean Water Act . . . ) require procedures such as state or other federal agency certifications, public hearings, environmental impact statements, consultation, special studies, and testing which may prevent district engineers from being able to decide certain applications within 60 days."). The Corps is required to make its permit application decision "[o]nce the district engineer has <u>sufficient information to makes his public interest determination</u>" even if other federal agencies that share regulatory jurisdiction "have not yet granted their authorizations." Id. § 325.2(d)(4) (emphasis added).

Applicants are provided a maximum of thirty days to respond to the Corps's requests for additional information. Id. § 325.2(d)(5) ("The applicant will be given a reasonable time, not to exceed 30 days, to respond to the requests of the district engineer."). In the event that an applicant does not provide the additional information, the regulations give the Corps officials the option either to consider the application withdrawn or to make a "final decision"

on the application.  Id. ("The district engineer may make such requests by certified letter and clearly inform the applicant that if he does not respond with the requested information or a justification why additional time is necessary, then his application will be considered withdrawn or a final decision will be made, whichever is appropriate.  If additional time is requested, the district engineer will either grant the time, make a final decision, or consider the application as withdrawn.").  Section 325.2(a)(7) provides for procedures to notify an applicant if the Corps's final decision denies a permit application, as follows:  "If the final decision is to deny the permit, the applicant will be advised in writing of the reason(s) for denial. . . .  Final action on the permit application is the signature on the letter notifying the applicant of the denial of the permit . . . ."

The regulations also provide for an administrative appeals process.  33 C.F.R. § 331, which was added in 1999, sets forth the procedures for appealing a denial decision.  See id. § 331.1(a).  Section 331.10 provides the criteria for issuing a final Corps decision when a permit applicant administratively appeals the denial of a permit application, as follows:

> If the division engineer determines that the appeal is without merit, the final Corps decision is the district engineer's letter advising the applicant that the division engineer has decided that the appeal is without merit, confirming the district engineer's initial decision, and sending the permit denial or the proffered permit for signature to the appellant . . . .

Id. § 331.10(a).  Critically, the regulations governing administrative appeals codify the ripeness doctrine's requirement of a final agency decision, precluding federal court jurisdiction over challenges to permit denials until a final administrative appeal decision is made pursuant to 33 C.F.R. § 331.10.  See id. § 331.12.  The regulations prescribe, as follows:

> No affected party may file a legal action in the Federal courts based on a permit denial or a proffered permit until after a final Corps decision has been made and the appellant has exhausted all applicable administrative remedies under this part.  The appellant is considered to have exhausted all administrative remedies when a final Corps permit decision is made in accordance with § 331.10.

Id. § 331.12.

As defendant characterizes plaintiff's contention, the Corps deemed his application complete under 33 C.F.R. § 325.1(d)(9), when it issued the public notice, making plaintiff's

claim ripe for review.  See Def.'s Br. filed Mar. 10, 2011, at 3. 1/  Defendant argues that 33 C.F.R. § 325.1(d)(9) distinguishes between a complete application and "an application that contains information sufficient to evaluate a project." Id. at 4.  According to defendant, the "regulatory framework contemplates that an application may be deemed 'complete,' but that does not necessarily mean that sufficient information has been provided in order to evaluate an application." Id.  Without sufficient information, defendant argues, the Corps cannot lend its expertise to determining the extent of development allowed.  See Oral Argument at 2:08:20-2:10:00, Mehaffy v. United States, No. 09-860 (Fed. Cl. Mar. 29, 2011) ("Oral Arg."). 2/

At oral argument defendant took the position that the procedures set forth in 33 C.F.R. § 325.2(a) do not permit the Corps to consider plaintiff's application withdrawn due to plaintiff's insufficient response to the Corps's requests for additional information. Id. at 2:18:45-2:19:00.  Defendant maintains that, once the application is deemed complete, the regulations require the Corps to issue the public notice and thereafter the District Engineer must issue his decision; the regulations do not permit delays for additional information from plaintiff to aid the evaluation process. Id. at 2:53:47-2:54:14; see also Def.'s Br. filed Mar. 10, 2011, at 4 ("Indeed, the Corps is required to move forward on a 'complete' application even if there is insufficient information available to evaluate the project.").  Thus, defendant represented that the Corps's Little Rock District Engineer takes the position that the regulations do not permit his office to hold an application in abeyance, particularly when dealing with an unresponsive applicant, such as plaintiff.  Oral Arg. at 2:54:15-2:54:40.

Defendant thus contends that the Corps followed the regulations in issuing the Denial Letter, but plaintiff's refusal to supply information deprived the Corps of the opportunity to apply its expertise to a meaningful permit application and, as a result, the Decision Document does not reflect fully the Corps's views as to the extent of permitted development under the regulations. Should plaintiff reapply with a more complete application, including a hydraulic study and alternatives analysis, defendant posits that the Corps possibly could approve the application. Id. at 2:17:45-2:18:15, 2:55:45-2:56:00.  Finally, defendant warns that a decision holding plaintiff's claim to be ripe would create an incentive for landowners to perform only minimal compliance when submitting a section 404 permit application, with

_____

1/ Defendant's characterization of plaintiff's position is inaccurate.  Plaintiff asserts that his claim ripened once he exhausted his administrative appeal. See Pl.'s Br. filed Feb. 15, 2011, at 7-8.

2/ The oral argument held on March 29, 2011, was recorded by the court's "do-it-yourself" Electronic Digital Recording ("EDR") system.  The times noted in citations to the oral argument refer to the EDR record of the oral argument.

the anticipation that a *pro forma* denial would result in a ripened takings claim.  Id. at 2:23:43-2:24:10, 2:54:40-2:54:55.

3.  Interpreting agency regulations

"The rules of statutory construction apply when interpreting an agency regulation." Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).  The court begins its analysis of the regulations by "reviewing its language to ascertain its plain meaning." Am. Airlines, Inc. v. United States, 551 F.3d 1294, 1299 (Fed. Cir. 2008).  The court may consider the language of other, related regulations to guide its analysis.  Roberto, 440 F.3d at 1350.  When the regulation's text is clear, the court's inquiry ends with the plain meaning. Id.  The court will defer to the relevant agency's interpretation of a statute or regulation that is "not clear on its face or does not speak directly to an issue." Am. Airlines, 551 F.3d at 1299-1300 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984)); see also Roberto, 440 F.3d at 1350 ("[I]f the regulation is silent or ambiguous, the court then gives deference to the agency's own interpretations.").  However, the court need not follow an agency's interpretation of its own regulations when it is erroneous or inconsistent with the regulation.  Chattler v. United States, 632 F.3d 1324, 1328 (Fed. Cir. 2011) ("We defer to the agency's interpretation of its own regulation unless it is 'plainly erroneous or inconsistent with the regulation.'" (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).

The court carefully has reviewed the precise sequence of mandatory actions required by the Corps's own regulations and defendant's application of them to the facts at bar.  What is patently obvious is that the Army has promulgated a comprehensive matrix for the section 404 permit application process.  The regulatory scheme encompasses procedures that begin with initial consultations and substantive requirements for the application's contents; followed by the public notice process and coordination with other agencies that share regulatory jurisdiction, the evaluation itself, and the issuance of a decision; through to the final administrative appeal process.  For the following reasons, the court concludes that, under this comprehensive regulatory scheme, the Corps's denial of plaintiff's section 404 permit application was the product of an informed evaluation that was adjudicated through a final administrative appeal and, therefore, constitutes a final decision for ripeness purposes.

First, defendant correctly identifies many shortcomings in plaintiff's efforts to supply an informed application.  See Def.'s Br. filed Jan. 18, 2011, at 14-15.  On September 25, 2006, the Corps sent plaintiff a letter requesting additional information, including a narrative of the project's purpose, a location map of the project area, plans or drawings for proposed development, and an alternatives analysis.  See DX L.  Defendant aptly faults plaintiff's one-

18

page letter response stating that some of the property would be utilized to store construction equipment, but which

> did not indicate where on the Subject Property he intended to store the equipment. He did not provide any designs for a storage structure. He also did not provide any details regarding the type of construction equipment at issue. . . . He did not provide any construction details for the filling project. He did not provide any drawings of the proposed development. Plaintiff also did not provide any alternatives analysis.

Def.'s Br. filed Jan. 18, 2011, at 5-6. But see Scott Dep. at 43-44 (stating that "I got some of the things that [the Corps] requested," and agreeing that this information included "a narrative of the purpose of the proposed project," "a location map indicative of the project impact area, type of fill, and total quantity of fill associated with the project," and plaintiff's response that he was "not aware of alternative sites"). Plaintiff did not follow the Corps's recommendation that he retain a consultant to conduct a hydraulic analysis, nor did he provide information in response to any of the Corps's other requests in its February 15, 2007 letter following the public comment period. See Def.'s Br. filed Jan. 18, 2011, at 8 ("Plaintiff did not provide any of the requested information."). Indeed, the application itself was only a few pages in length, most of which recited the Corps's instructions, regulations, and questions. Cf. Cooley, 324 F.3d at 1300 (explaining that section 404 permit applicant spent more than three years prosecuting its wetlands fill permit application, including submitting four alternative site analysis).

The regulations contemplate that, at this posture, plaintiff's application was not complete, and the Corps was not required to consider it further. Once plaintiff failed to respond to the Corps's February 15, 2007 letter with the requested additional information, the regulations gave the Corps the option of either proceeding with a merits determination, or—presumably, if the missing information precluded a full review on the merits—deeming the application withdrawn. See 33 C.F.R. § 325.2(d)(5). The provision clarifies that, even if an applicant requests additional time to comply, the Corps can "either grant the time, make a final decision, or consider the application as withdrawn." Id.

Logically, in the face of plaintiff's recalcitrance to conduct a hydraulic study or investigate alternative development proposals, the Corps should have elected to notify plaintiff that either he could comply with its requests or the Corps would deem his application withdrawn. However, the record discloses that the Corps did not consider it necessary to adhere to the regulation's option to "clearly inform the applicant" that his

19

application would be considered withdrawn. 3/ <u>See</u> DX  N.  The February 15, 2007 letter instructed plaintiff only that he was "hereby given the opportunity to review these letters and submit your views and rebuttals.  We would appreciate receiving any response you may have to these comments within 30 days of the date of this letter.  If we receive no response, we will proceed with a decision on your request."  <u>Id.</u> at COEAR000080; <u>see also</u> Affidavit of Mike Mehaffy, Feb. 14, 2011, ¶ 10 ("I was also never advised by Tim Scott or anyone else representing the Corps of Engineers that my permit application could not be processed or would be withdrawn due to a lack of information.").  The Corps had two options: (1) to deem the application withdrawn, or (2) to issue a final decision predicated on the express finding that it had sufficient information to make the evaluation required by the regulation.

During oral argument defendant vigorously disputed plaintiff's contention that the regulations permit the Corps to deem his application withdrawn.  Instead, defendant reiterated its position that the regulations required the Corps to act on plaintiff's application even if plaintiff did not provide further information or studies.  Generally, the court defers to the Corps's interpretation of its own regulations.  <u>See</u> <u>Chattler</u>, 632 F.3d at 1328. However, in this instance the court is at an utter loss to rationalize against the applicable regulation defendant's position that the Little Rock District Engineer could not deem plaintiff's application withdrawn, which is contradicted by the plain and unambiguous terms of 33 C.F.R. § 325.2(d)(5).  Defendant's interpretation of the regulation is erroneous, and the court does not accept it.  <u>See</u> <u>id.</u> 4/

Defendant nevertheless is correct that the "regulatory framework contemplates that an application may be deemed 'complete,' but that does not necessarily mean that sufficient information has been provided in order to evaluate an application."  Def.'s Br. filed Mar. 10, 2011, at 4.  This is precisely why the regulations also provide the Corps with the option to deem an application withdrawn after the public comment period.  It is a "cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it."  <u>Hawkins v. United States</u>, 469 F.3d 993, 1001 (Fed. Cir. 2006) (citation omitted)

_____

3/  Although doing so was clearly at the Corps's discretion, as is evidenced by the provision's use of the term "may."  <u>See</u> 33 C.F.R. § 325.2(d)(5) ("The district engineer <u>may</u> make such requests by certified letter . . . ." (emphasis added)).

4/  Thus, defendant's concern about establishing an incentive for future landholders to provide minimal compliance with the permit application process is misplaced.  The Corps has the authority to withdraw an application on precisely those grounds.  It merely needs to exercise that authority.

(internal quotation marks omitted).  When 33 C.F.R. § 325.1(d)(9) 5/ is read together with 33 C.F.R. § 325.2(d)(5), 6/ the latter of which operates after the public comment period—when the application already has been deemed complete for the purposes of public notice—the effect is to provide the Corps with a discretionary two-pronged approach.  If the applicant does not provide the requested additional information that the Corps deems "essential to make a public interest determination," 33 C.F.R. § 325.1(e), thus precluding the Corps from determining the extent of development allowed under the regulations, the Corps can effect a withdrawal of the application.  Alternatively, the Corps can decide that it has sufficient information to make a merits analysis denying the application.  The clear implication is that the Corps only makes a merits determination once it determines that it has sufficient information to do so.

The regulations do not give the Government a third option urged by defendant. Nowhere in the regulatory scheme is it contemplated that a challenge to a permit denial will be declared unripe because the Corps did not make a fully informed final decision.  Put another way, once the Corps takes the position that it has sufficient information to make a merits decision, issues it as a denial, and entertains an administrative appeal, the Department of Justice cannot take the position in subsequent litigation that the decision was not based on sufficient information.  When these regulations on processing are read in light of 33 C.F.R. § 331.12 (denying federal court jurisdiction over takings challenge to permit denial until "after a final Corps decision has been made"), it is apparent that the regulatory scheme contemplates that any "final decision" will be the product of a fully informed merits evaluation that the Corps can stand behind.  By comparison, the result defendant seeks would allow the Department of Justice to second-guess decisions that the Corps regarded as final. This would be grossly unfair to landowners, who would never be in a position to assess before filing suit whether the results of their administrative appeals are truly final.  See Pl.'s Br. filed Feb. 15, 2011, at 13 ("If this were not the case, an administrative agency decision would never be ripe for judicial review as the agency could continually contend that the matter was subject to additional analysis.").

---

5/   "An application will be determined to be complete when sufficient information is received to issue a public notice.  The issuance of a public notice will not be delayed to obtain information necessary to evaluate an application."  33 C.F.R. § 325.1(d)(9) (citation omitted).

6/   "The district engineer may . . . clearly inform the applicant that if he does not respond with the requested information . . . then his application will be considered withdrawn or a final decision will be made, whichever is appropriate."  33 C.F.R. § 325.2(d)(5).

21

Defendant's reading also results in the court's second-guessing the Corps to make *ad hoc* determinations about the degree of effort, cooperation, or diligence an applicant exercised. This is an appropriate role for the court only in determining whether pursuit of an application would be futile, 7/ but is contrary to the express terms of 33 C.F.R. § 331.12 once the Corps has satisfied itself that sufficient information is available to make an informed analysis and a final decision on the merits has issued.

Nothing in the record suggests that the Corps did not stand behind its evaluation. The Corps did not deny plaintiff's section 404 permit application due to a lack of information from plaintiff. See Denial Letter at COEAR000008 (providing in part "my staff has determined that the fill activity does not comply with the [EPA's] Section 404(b)(1) Guidelines"). While the Denial Letter noted that the public comments uniformly faulted plaintiff's application for its lack of information and alternative analysis, the Corps did not state that its denial was based upon such deficiencies, or that they prevented the Corps from determining the extent of development allowed under the section 404(b)(1) Guidelines. The one instance pointed to by defendant, see Def.'s Br. filed Jan. 18, 2011, at 9, where the Decision Document states that "[i]nadequate information was provided by the applicant to thoroughly evaluate his project," Decision Doc. at COEAR000022, was made in response to comments from the AWF, see id. Defendant's contention that this statement shows that the Corps could not render a meaningful evaluation reads too much into the sentence. To the contrary, the Decision Document stated that "sufficient information was made available to make a decision without the need for a public hearing." Id. at COEAR000043. The Corps's denial letter was on the merits, unequivocally stating that the application was "contrary to the public interest and does not comply with EPA's 404(b)(1) Guidelines." Id. at COEAR000042.

Nor did the fact that plaintiff failed to provide an alternative analysis preclude the Corps from conducting its own analysis and incorporating that analysis into its decision. According to the deposition testimony of Joyce C. Perser, the Little Rock District Regulatory Evaluation Chief, if the Corps did not obtain an alternative analysis from plaintiff, the Corps "could proceed with the permit evaluation, but we would have to do the alternative analysis." Dep. of Joyce C. Perser, Sept. 15, 2010, at 35. The Corps's Senior Project Manager administering plaintiff's fill permit application, Mr. Scott, testified that he "needed that additional information but could go on [to a merits determination] with what I had." PX 10 (Scott memorandum dated Feb. 23, 2007, summarizing Mr. Scott's notes following his phone

---

7/   Plaintiff has not pled the futility exception to the ripeness doctrine articulated in Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 739 (1997), and, as such, it is not at issue.

call with plaintiff). Therefore, no question exists that the Corps made a final decision when it denied plaintiff's administrative appeal. See PX 13 (Corps's April 15, 2008 "final administrative appeals decision by the Corps"). Plaintiff thus satisfied the requirement that he exhaust his administrative remedies. See 33 C.F.R. § 331.12.

### 4. Substantive sufficiency of final decision

"While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." Palazzolo, 533 U.S. at 620. Therefore, the court next considers whether there remains "uncertainty as to the land's permitted use" based on the Corps's determination. See id. at 622. Precedential case law demonstrates that determining the scope of permitted use, i.e., whether alternative procedures are available under the land-use regulations, is integral to determining whether the final decision is ripe for judicial review.

Defendant demurs that precedent from the Supreme Court and the United States Court of Appeals for the Federal Circuit establishes that plaintiff's failure to submit a meaningful section 404 permit application renders his claim unripe as a matter of law because the extent of the permitted use of plaintiff's parcel is still unknown. See Def.'s Br. filed Jan. 18, 2011, at 12-14 (citing, inter alia, Palazzolo, 533 U.S. at 618; MacDonald, 477 U.S. at 351; Riverside Bayview Homes, 474 U.S. at 126, 129 n.6; Williamson Cnty., 473 U.S. at 186; Morris, 392 F.3d at 1376-77; Howard W. Heck & Assocs., Inc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998); Bailey, 78 Fed. Cl. at 252); see also Def.'s Br. filed Mar. 10, 2011, at 10 ("Plaintiff wholly ignores the holdings of Williamson County and MacDonald, cases where the Supreme Court found that, despite an agency decision denying a land use permit, a takings claim had not ripened because the extent of the permitted development on the subject property was unknown."). For the following reasons, the court disagrees with defendant's analysis of these precedents.

Williamson County is the seminal case in which the Supreme Court enunciated the rule that, for a takings claim challenging the application of a land-use regulation to be ripe, "the government entity charged with implementing the regulations has [to] reach[] a final decision regarding the application of the regulations to the property at issue." Williamson Cnty., 473 U.S. at 186. In Williamson County the Court held that the takings claim was not ripe because the developer bringing the challenge failed to seek available variances to the land-use regulations that would have permitted development; consequently, no final decision had been reached by the regulatory agency. See id. at 187-88 ("[R]espondent did not then seek variances that would have allowed it to develop the property according to its proposed

plat, notwithstanding the Commission's finding that the plat did not comply with the zoning ordinance and subdivision regulations.").

In MacDonald the Court held that no final decision upon which to predicate a taking was before the Court when the opinions of lower courts left open the possibility that some development was permissible. See MacDonald, 477 U.S. at 352-53 ("[T]he holdings of both courts below leave open the possibility that some development will be permitted, and thus again leave us in doubt regarding the antecedent question whether appellant's property had been taken."). The Court clarified that its holdings reflected its "insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." MacDonald, 477 U.S. at 351; accord Agins v. City of Tiburon, 447 U.S. 255, 260 (1980) (takings claim against zoning ordinance authorizing development of one to five homes on tract of land not ripe where appellants had not applied for improvements to property), overruled on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005).

In Heck, which had its genesis in the Corps's denial of a section 404 permit application, the Corps "removed the application from active consideration due to [the plaintiff's] unexcused failure to submit [a] statutorily-required state water quality certificate ("WQC") to support its federal permit application." 134 F.3d at 1469-70. The Corps provided notice to the plaintiff that its application "was being withdrawn from active status until [the plaintiff] submitted the WQC." Id. at 1471. The Federal Circuit held that the takings claim was not ripe because the Corps did not issue a final decision on the merits when it cancelled the plaintiff's application as incomplete and allowed the plaintiff the opportunity to re-file. See id. at 1472 ("[T]he Corps did not deny the permit. . . . Nor did the Corps issue a merits-based determination here regarding the proposed development's effect on water quality standards because Heck had not provided the Corps with the information required by law."); accord Morris, 392 F.3d at 1374-77 (holding takings claim not ripe when plaintiff failed to file permit request with Corps, stating therefore, "there has been no final agency decision").

The court has reviewed the precedents carefully and concludes that they do not support defendant's argument that the court cannot determine, based on the Decision Document, the extent to which plaintiff's use of the subject property is allowed under the regulations. Rather, these cases stand for the proposition that a takings claim challenging a land-use regulation will not be ripe for review where the plaintiff has not sought out all available variances or waivers, or otherwise exhausted all administrative remedies. See Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 739 (1997) (explaining that Williamson County and its progeny "addressed the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the

decision of a regulatory body invested with great discretion, <u>which it has not yet even been asked to exercise.</u>" (emphasis added)).  The cases had in common a missing factual predicate that is required to ripen a regulatory takings claim: some affirmative regulatory requirement remained at the local level that the plaintiffs did not fulfill or pursue.  Thus, as the Court explained in <u>Palazzolo</u>, these cases "stand for the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of the challenged regulation." <u>Palazzolo</u>, 533 U.S. at 620.

Moreover, as shown by the Court in <u>Suitum</u>, the Court's ripeness jurisprudence with regard to regulatory takings has developed around questions concerning state or local land-use regulations, where discretion still remained within local courts or agencies to grant or deny a development request.  <u>See Suitum</u>, 520 U.S. at 733-38 (explaining "two independent prudential hurdles to a regulatory takings claim brought against a state entity in federal court" and discussing, <i>inter alia</i>, <u>Williamson County</u>, <u>Agins</u>, and <u>MacDonald</u>); <u>see also id.</u> at 738 ("[T]wo points about [<u>Williamson County</u>'s] requirement [for finality] are clear: it applies to decisions about how a takings plaintiff's own land may be used, and it responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer.").  The case at bar, by contrast, falls under the comprehensive regime of the CWA, in which the procedures that the Corps and the applicant must follow are built in to the regulatory scheme, up to and including the administrative appeals process.  Nor do the applicable regulations provide for the types of variances or waivers at issue in <u>Williamson County</u>, <u>Agins</u>, and <u>MacDonald</u>.  Instead, as discussed above, the regulations make clear that the Corps's permit application denial became final once the Corps denied the merits of plaintiff's administrative appeal.  <u>See</u> 33 C.F.R. §§ 331.10, 331.12; <u>cf.</u> <u>Bayou Des Familles Dev. Corp. v. United States</u>, 130 F.3d 1034, 1039-40 (Fed. Cir. 1997) ("This case differs from those in which an initial permit denial may be overcome by variances or appeals to higher administrative authorities. . . . In addition, the Corps' denial was final [in part] . . . because no administrative appeal mechanism was provided under its regulations . . . .").  <u>8/</u>

By contrast, three of the cases relied on by defendant, <u>Palazzolo</u>, <u>Washoe County v. United States</u>, and <u>Bailey</u>, exemplify rejection of the same ripeness argument that defendant now presses.  <u>See Palazzolo</u>, 533 U.S. at 619, 621 (rejecting State of Rhode Island's

---

<u>8/</u>  In <u>Bayou Des Familles</u>, the Federal Circuit held that a challenge to a section 404 permit denial ripened upon the Corps's decision denying the permit application, where the denial was based on the land parcel's inclusion in a protected park zone, and the effect of the permit denial destroyed the parcel's market value.  <u>See</u> 130 F.3d at 1039-40.

argument that landowner's claim not ripe because of his "failure to explore 'any other use for the property that would involve filling substantially less wetlands'" when land-use agency's "decisions make plain that the agency interpreted its regulations to bar petitioner from engaging in any filling or development activity on the wetlands" (citation omitted) (internal quotation marks omitted)); Washoe Cnty., 319 F.3d 1320, 1324 (Fed. Cir. 2003) ("We reject the government's position that ripeness is lacking" when "the government . . . has not identified any further administrative step available to Washoe County in order for it to have obtained further finality in the permit application process . . . ."); Bailey, 78 Fed. Cl. at 252-53 (rejecting Government's argument that a challenged restoration order "is not the *type* of decision which may be considered ripe for takings claim purposes"). A brief analysis of these cases is instructive to the resolution of this issue.

In Bailey the Court of Federal Claims expounded on the requirements necessary for an agency's decision to ripen a landowner's regulatory takings claim: "it must possess two basic characteristics—that it be a *final* decision, and that it demonstrate the extent to which use of the subject property will be allowed under the applicable regulations." 78 Fed. Cl. at 252. Regarding the requirement that the decision demonstrate the property's permitted use, the court observed that it "may be either explicit or implicit in the decision." Id. at 252 n.25 (citing, *inter alia*, Palazzolo, 533 U.S. at 619-22). The court concurs with this analysis. Palazzolo provides a useful illustration as to how the extent of the property's allowable use may be implicit in the agency's decision.

In Palazzolo, the Supreme Court's key opinion concerning the ripeness of a regulatory takings claim, the Court considered a challenge to the Rhode Island Coastal Resources Management Council's (the "council") denial of a permit application to fill eleven acres of an undeveloped tract of land that bordered Winnapaug Pond, a salt marsh that was designated as a protected coastal wetlands, in order to construct a private beach club. See 533 U.S. at 614-15. The council's regulations prohibited filling the marsh unless the landowner obtained a special exception from the council. Id. at 615. To obtain the special exemption, "the proposed activity must serve 'a compelling public purpose,'" a requirement the council deemed not met by the petitioner's proposal. Id. The petitioner then brought a takings claim in Rhode Island state court. Id. The Rhode Island Supreme Court held the claim not ripe because doubt remained as to the extent of development the council would allow if petitioner would "explore 'any other use for the property that would involve filling substantially less wetlands.'" Id. at 619 (citation omitted). The United States Supreme Court disagreed, holding the claim ripe for review.

The Court reasoned that the state high court was wrong to conclude that the council would accept a proposal for "'any other use for the property that would involve filling substantially less wetlands,'" id., because, once it determined that the project failed to serve

a compelling public purpose, "[t]here is no indication the Council would have accepted the application had petitioner's proposed beach club occupied a smaller surface area," id. at 620. The Court was able to determine "the extent of permitted development," id. at 618 (citation omitted) (internal quotation marks omitted), because, implicit in the council's decision was the result that "the agency interpreted its regulations to bar petitioner from engaging in any filling or development activity on the wetlands," id. at 621.

The Court also expounded on the ripeness principles set forth in Williamson County and its other ripeness decisions, underscoring that it is the land-use agency, not a reviewing court, that determines how much development is allowed. The Court explained that those cases "stand for the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of the challenged regulation." Id. at 620 (emphasis added). Thus, the predicate for bringing a takings claim is the requirement that the landowner

> follow[] reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on the property is not known and the regulatory taking has not yet been established.

Id. at 620-21. As previously discussed "these ordinary processes" in the case at bar were followed when plaintiff exhausted his administrative remedies, which, under the regulations, conclusively established finality of the Corps's decision.

Because plaintiff did not participate meaningfully in the Corps's exploration of alternative uses, defendant argues that the extent of development permitted cannot be determined from the Corps's decision. The court finds and holds that the Corps's decision leaves no uncertainty as to the land's permitted use. The Corps's Denial Letter stated that the fill activity "does not comply with the [EPA's] Section 404(b)(1) Guidelines." Denial Letter at COEAR000008. The accompanying Decision Document grounds the Corps's denial squarely upon the section 404(b)(1) Guidelines' presumption that a practicable alternative to filling wetlands is available when the "basic project purpose is not water dependant." See Decision Doc. at COEAR000040. Instructed by this presumption, the Corps developed its own alternative analysis, which consisted of doing nothing, limiting plaintiff's development to the uplands portion of his property, or requiring plaintiff to purchase other adjacent property. See id. ("Development of the uplands adjacent to the wetlands could be utilized for equipment storage and development. . . . Approximately 30 acres of non-jurisdictional uplands are presently owned by the applicant at the location and

are available for development. . . . A 2006 aerial photo reveals that there are approximately 106 acres of upland, undeveloped property immediately adjacent to the applicant's existing business."). The Corps objected to the placement of fill because the area is "within a mapped floodway." <u>Id.</u> at COEAR000041. Moreover, the evaluation concluded that plaintiff's project "as proposed/constructed will be contrary to the public interest." <u>Id.</u> at COEAR000043.

Considering that the purpose of plaintiff's project was to create space for equipment storage for his construction company and to increase the land's value for future commercial development, <u>see id.</u> at COEAR000039 (conceding that "[p]roperty values would increase due to land being elevated out of flood elevations"); <u>see also</u> Scott Dep. at 49-50 (agreeing that plaintiff told Corps that he wanted to fill because it would be high value development property if it did not flood), the Corps has construed the regulations as effectively foreclosing the possibility of commercial development on plaintiff's wetlands. This is tantamount to the same determination regarding whether the landowner was barred from engaging in filling or developmental activities on the wetlands in <u>Palazzolo</u>. <u>See Palazzolo</u>, 533 U.S. at 621 ("On the wetlands there can be no fill for any ordinary land use. There can be no fill for its own sake; no fill for a beach club, either rustic or upscale; no fill for a subdivision; no fill for any likely or foreseeable use. And with no fill there can be no structures and no development on the wetlands.").

Plaintiff cites the Federal Circuit's opinion in <u>Cooley</u>, in which the court rejected the Government's argument that the Corps's denial of a section 404 permit application did not constitute a final decision. <u>See Cooley</u>, 324 F.3d at 1302. In holding the claim ripe, the court emphasized that the Corps issued an unconditional denial letter essentially prohibiting any commercial development on the applicant's site, which stated that the issuance of a permit "'would be contrary to the public interest,'" and the denial letter was accompanied by a "thorough, fifteen page, single-spaced 'Evaluation and Decision Document'" explaining the merits of the decision. <u>Id.</u> ("The denial effectively prohibited any commercial development on Cooley's site, resulting in a loss of at least 98.8% of the land value."). The court also noted that "no Corps regulation permitted an administrative appeal" and that the Corps's district engineer determined that "the Corps had received adequate information from Cooley to deny the permit on the merits." <u>Id.</u>

Similarly, in the instant case, the Corps issued an unconditional denial of plaintiff's section 404 application, which was accompanied by a thirty-three page, single-spaced Decision Document analyzing the merits of plaintiff's permit request. While the Corps would have preferred that plaintiff conduct the requested hydraulic study and submit an alternatives analysis, the evaluation stated that "sufficient information was made available to make a decision without the need for a public hearing." Decision Doc. at COEAR000043.

Subsequently, plaintiff exhausted his administrative appeals process when the Corps issued its April 15, 2008 final decision denying his appeal.

## CONCLUSION

The court concludes that these facts and law operate to preclude plaintiff from engaging in any commercial development on the wetlands that are subject to the easement. The court emphasizes that any characterization regarding the extent of permitted development on plaintiff's land is limited to the ripeness question presented in the Corps's regulations. This is tantamount to the same determination regarding whether the landowner in Palazzolo was barred from engaging in filling or developmental activities in the wetlands. See Palazzolo, 533 U.S. at 671. Therefore, the Corps has issued a final decision, and plaintiff's claim before the Court of Federal Claims is ripe for review. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Plaintiff's takings claim is ripe for review, and defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

2. By May 16, 2011, the parties shall file Joint Status Report proposing a course for further proceedings.

/s/ Christine O.C. Miller

_____

**Christine Odell Cook Miller**
Judge

29