# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 09-860L
(Filed January 10, 2012)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * *   * | |
| | *  Takings; regulatory taking; |
| **MIKE MEHAFFY,** | *  summary judgment; denial of |
| | *  application for fill permit |
| Plaintiff, | *  pursuant to section 404 of the |
| | *  Clean Water Act, 33 U.S.C. |
| v. | *  § 1344 (2006); determination of |
| | *  whether defendant has |
| **THE UNITED STATES,** | *  established under RCFC 56 that |
| | *  plaintiff can show no regulatory |
| Defendant. | *  taking based on <u>Penn Central</u> |
| | *  analysis. |
| * * * * * * * * * * * * * * * * * * * *   * | |

<u>Bruce B. Tidwell</u>, Little Rock, AR, for plaintiff.

<u>E. Barrett Atwood</u>, San Francisco, CA, with whom was <u>Assistant Attorney General Ignacia S. Moreno</u>, for defendant. <u>Clay Weisenberger</u>, <u>Jennifer Dalton</u>, and <u>Tamar Gerhart</u>, U.S. Army Corps of Engineers, Little Rock, AR, of counsel.

## MEMORANDUM OPINION AND ORDER

<u>MILLER</u>, Judge.

This case is before the court after argument on defendant's motion for summary judgment. This is the second opinion issued by the court on Thomas Michael Mehaffy's ("plaintiff") claim for compensation as mandated by the U.S. Constitution based on a taking by the U.S. Army Corps of Engineers (the "Corps") of his riparian property by denying his fill permit application under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (2006). See Mehaffy v. United States, 98 Fed. Cl. 604 (2011) (denying ripeness challenge to claim and finding that agency decision was final and prohibited plaintiff from commercial development on the subject wetlands).

## FACTS

The following facts are taken from the parties' Joint Stipulation of Facts filed on September 2, 2011, and from those facts agreed to by plaintiff in Mehaffy's Response to

Proposed Findings of Uncontroverted Fact filed October 6, 2011. 1/  Plaintiff is a resident of Pulaski County, Arkansas, and the owner of seventy-three acres of riparian land on the Arkansas River in North Little Rock ("the subject property").  Joint Stipl. ¶¶ 1, 2.  Crystal Hill Road borders the north end of the subject property, and the Arkansas River borders its south end; two parcels of land border the subject property to the east and west.  Id. ¶ 2.  In 1970 the subject property was owned by Nomikano, Inc. ("Nomikano"), an Arkansas corporation holding assets for the benefit of the Mehaffy family and whose business was primarily conducted by the Honorable Pat Mehaffy, plaintiff's father.  See id. ¶¶ 3, 4.  Other family members—including plaintiff—and at least one non-family member—Harry W. Parkin—served as officers of the corporation.  See id. ¶ 4.

On March 2, 1970, the United States purchased a flowage easement ("the easement") from Nomikano that, at the time the easement was granted, covered roughly forty-nine acres of the subject property.  Id. ¶¶ 3, 9.  The Government purchased the easement as part of the McClellan-Kerr Arkansas River Navigation System ("the Arkansas River project"), see id. ¶ 5, an effort to construct a series of locks and dams along the Arkansas River.  The easement was necessary to the project because the subject property bordered Lock and Dam No. 7.  Id. Negotiated by the Hon. Pat Mehaffy, the Easement Deed granted to the United States the

> "perpetual right . . . to permanently overflow, flood and submerge the land lying below elevation 249, [mean sea level ("m.s.l.")], and to occasionally overflow, flood, and submerge the land lying above elevation 249, m.s.l., in connection with the operation and maintenance of Lock and Dam No. 7, Arkansas River project."

Id. ¶ 6 (quoting Easement Deed, dated Mar. 2, 1970, at 1 (conveying the easement from Nomikano to the United States (the "Easement Deed"))).  The Easement Deed also provided that

> "no structures for human habitation shall be constructed or maintained on the land; [and] that no other structures shall be constructed or maintained on the

---

1/  This court's first opinion presented a factual summary that was compiled from the parties' initial filings and briefs, and that recitation contained citations to particular documents submitted by the parties.  Because that opinion was issued before the parties filed their Joint Stipulation of Facts, the court deems it prudent to restate the factual background to the present action relying on the formulation of the facts now agreed upon by the parties. Regarding those stipulated facts based on documents and exhibits, this court cites to the appropriate paragraph in the Joint Stipulation.

land except as may be approved in writing by the representative of the United States in charge of the [Arkansas River] project and that no alterations to the contour of the land shall be made without such approval."

Id. ¶ 7 (alteration in original) (quoting Easement Deed at 1).

Judge Pat Mehaffy, however, did negotiate a reservation of certain rights. According to the Easement Deed, reserved to Nomikano

"its successors and assigns, [are] all such rights and privileges as may be used and enjoyed without interfering with the use of the [Arkansas River] project for the purposes authorized by Congress or abridging the rights and easement hereby conveyed. Included among rights specifically reserved to the landowner, its successors and assigns, is the right to place fill in the area of said tract and to place structures on said fill above elevation 252 feet, m.s.l. Notwithstanding, the above exception does not permit the placing of structures for human habitation thereon."

Id. ¶ 8 (alteration in original) (quoting Easement Deed at 1-2). This reservation of the right to place fill on those areas of the subject property burdened by the easement above 249 feet m.s.l. was specifically—and insistently—negotiated by Judge Mehaffy. Id.

Subsequent to the conveyance of the Easement Deed, Congress enacted the Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566 (as amended at 33 U.S.C. §§ 1251-1387 (2006)) (the "CWA"). Id. ¶ 10. On October 10, 1980, plaintiff, 2/ via a letter addressed to Nomikano from the Corps, was notified that the subject property and Easement Deed were subject to the CWA. Id. ¶ 11. The Corps's letter informed plaintiff that a section 404 permit—a wetlands regulatory instrument created by the CWA—would be required should Nomikano desire to place fill material in any of the wetlands located on the subject property. Id. Prescinding a conflict such as the one currently before the court, the letter further

---

2/ Nomikano was plaintiff's predecessor in title, although the parties stipulated that "plaintiff" received notice. Joint Stipl. ¶ 11. Plaintiff has taken the position that, as a member of the Mehaffy family, the negotiation of the Easement Deed was for his benefit and that, therefore, his investment-backed expectations cannot be severed from the original Easement Deed. See Pl.'s Br. filed Oct. 6, 2011, at 21 (citing Negotiations Report, dated Feb. 24, 1970, at App. Tab 3). However, as discussed infra, plaintiff stipulated as to the chain of ownership, the sale from Nomikano to the Mehaffy Construction Co. ("MCC") at fair market value, and the sale from MCC plaintiff for a nominal sum.

informed plaintiff that the reservation in the Easement Deed, by itself, "'is not sufficient to authorize work requiring authorization under [the CWA].'" Id. (quoting October 10, 1980 letter from Col. Dale K. Randels, P.E., Corps of Engineers District Engineer, to Thomas M. Mehaffy).

On February 18, 1987, Nomikano was dissolved and its assets were liquidated. Id. ¶ 12. During this process the subject property was sold to Mehaffy Construction Company, Inc. ("MCC"), in a negotiated, arm's-length transaction for $75,000.00—the fair market value at the time of the sale. Id. ¶ 13. MCC, as well as two other corporations, were formed by plaintiff to conduct his construction business. Id. ¶ 14. Plaintiff was the main executive of the construction corporations until passing control of day-to-day operations to his son, Pat Mehaffy. Id. ¶ 15. Subsequent to this turnover of managerial control, on May 9, 2000, MCC sold the subject property to plaintiff for $10.00 for tax purposes. Id. ¶ 16. Shortly thereafter, in 2001, the Corps conducted a wetlands delineation of the subject property, and it identified approximately forty-three acres as constituting wetlands. Id. ¶ 17. Most of the uplands of the subject property—land that is not identified as wetlands—is located on the northern end along the Crystal Hill Road frontage. Some of the uplands are located on the southern end of the subject property, interspersed between areas of delineated wetlands. Id.

In 2004 the Mehaffys coordinated with the Corps to undertake a project to clear and level a section of the uplands on the subject property. Id. ¶ 18. Presumably in an attempt to avoid the areas, Pat Mehaffy requested the Corps to identify the wetlands-delineated area on the subject property. Id. After the Corps's compliance with this request, the Mehaffys' construction companies cleared and leveled approximately nine to ten acres (roughly half) of the uplands portion of the subject property. Id. The Mehaffys then began to use this portion of cleared land as a storage yard for their construction business. Id.

On September 5, 2006, plaintiff submitted a section 404 permit application to the Corps. 3/ Id. ¶ 19. By way of the permit application, plaintiff sought to obtain a section 404 permit to fill approximately forty-eight acres of wetlands on the subject property. Id. However, the details provided in the permit application were sparse. As a description of the requested project, plaintiff simply stated, "'[to] [f]ill in property above elevation 252 m.s.l.'"; and for the purpose of the project, plaintiff provided only "'[r]ight granted [to] us in 1970 Easement [Deed].'" Id. (alterations in original). By letter of September 25, 2006, the Corps responded to plaintiff's permit application and requested additional information from plaintiff that the Corps considered "'necessary prior to processing your request.'" Id. ¶ 20.

_____

3/ Plaintiff has not sought any permits relating to the development of the subject property other than the section 404 permit application. Id. ¶ 36.

4

The Corps requested that plaintiff provide the following: (1) a narrative of the purpose of the project, (2) a location map and any plan or profile drawings for the proposed development, and (3) any potential alternative sites or project designs that could avoid or minimize any wetlands impact.  Id.  The Corps emphasized this third item, stressing the importance of demonstrating that no practicable, less environmentally damaging alternatives existed to the proposed project.  Id.

Plaintiff responded to the Corps's request for additional information on November 28, 2006.  Id. ¶ 21.  Plaintiff's response letter included a location map and information on the amount of fill that would be used to complete the project.  Id.  Plaintiff also included a brief narrative of the proposed purpose of the project; however, aside from the explanation that some of the filled property would be used to store construction equipment, the narrative merely reiterated that the purpose of the project was to fill the property pursuant to the Easement Deed.  Id.  Plaintiff further represented that it was his intention to fill the property with a slope from 260 feet m.s.l. to 253 feet m.s.l.  Id.  Noticeably absent from plaintiff's response was any information concerning alternative sites for the project.  Id.

After receipt of plaintiff's letter, the Corps determined that the permit application had sufficient information to be deemed complete and began preparing a public notice in accordance with 33 C.F.R. § 325.1(d)(9) (1997).  Id. ¶ 22.  Public notice was published on December 21, 2006, and the comment period ended on January 31, 2007.  Id. ¶ 23.  Various federal, state, and local agencies—including, inter alia, the United States Environmental Protection Agency (the "EPA"), the United States Fish and Wildlife Service (the "USF&WS"), the United States Federal Emergency Management Agency ("FEMA"), the City of North Little Rock and Pulaski County floodplain manager (the "Floodplain Manager"), and the Arkansas Department of Environmental Quality—responded and expressed concerns about the impact that plaintiff's project would have on the wetlands, the water quality of the Arkansas River, wildlife, and fisheries.  See id. ¶ 24.  For example, the EPA stated that the "'proposed project must be consistent with the [404(b)(1)] Guidelines, which require that a sequence of planning steps be demonstrated that involves avoidance, minimization, and compensation for wetland loss,'" but noted "'that there is insufficient information in the public notice [drawn from plaintiff's application] on the site configuration . . . to determine compliance with the Guidelines.'"  Id. (first alteration in original). 4/

_____

4/  The Arkansas Department of Environmental Quality, based on its comments, was also of the opinion that "'there is insufficient information to evaluate impacts, if any, to the water quality of the Arkansas River . . . .'" that would result from plaintiff's project.  Id. ¶24.

The USF&WS also focused on the lack of development details provided by plaintiff, and it made several recommendations on steps that plaintiff could take to minimize environmental impact. Id. It requested that plaintiff incorporate "'effective and appropriate erosion control before, during, and after any wetland and/or stream work.'" and recommended a riparian buffer along the Arkansas River "'to reduce sediment input, maintain riparian habitat, and to ensure bank stability.'" Id. To alleviate its concern, the USF&WS requested that a flood study and hydrologic assessment be completed before a permit was awarded to determine whether there would be any additional, indirect, or cumulative effects on water storage and wetland functions to adjacent areas, and it even recommended that the subject property be sold as a conservation area. Id. Further, both FEMA and the Floodplain Manager "'expressed concerns of increased flooding as a result of the development project,'" and the Floodplain Manager noted that the project would also "'require a floodplain development permit from the City of North Little Rock'" and "'certification by a professional engineer that no increase in flood heights would result'" from placing fill in the wetlands of the subject property. Id.

On February 15, 2007, the Corps provided plaintiff with summaries of the comments received and notified plaintiff that he was being "'given the opportunity to review these letters and submit [his] views and rebuttals,'" but "'[i]f [the Corps] receive[d] no response, [it would] proceed with a decision on [plaintiff's] request.'" Id. ¶ 23 (second alteration in original). The Corps did not inform plaintiff that it was a requirement that he respond to the public comments. Id. Also included in the Corps's letter were its specific concerns about the project 5/ and several additional requests for information from plaintiff. See id. ¶ 25. The Corps again notified plaintiff of the section 404(b)(1) Guidelines' requirement to demonstrate that there are no practicable alternatives to the project that are less harmful to the environment. Id. Accordingly, the Corps requested "'additional information regarding practicable alternatives to the placement of the fill material in wetlands.'" Id. The Corps additionally informed plaintiff that his proposed project involved placing fill material in a

_____

5/  The Corps expressed concerns in four areas, as noted in its summary:

"1) the potential for project alternatives that could avoid or minimize wetland impacts; 2) the loss of high quality forested wetlands and both wildlife and fisheries habitat and the need for adequate compensation; 3) [t]he cumulative impacts regarding the loss of wetlands, waterfowl and fisheries habitat and flood storage along the Arkansas River drainage basin; and 4) the loss of flood storage and the potential for flood damage."

Id. ¶ 26 (citation omitted).

6

designated floodway and requested that plaintiff "'determine and quantify his impacts to the 1% annual flood event, as well as lesser flood events, and verify that the proposed project does not increase flood heights.'" Id.  The Corps suggested that plaintiff hire a consultant to complete a hydraulic 6/ study to alleviate these and other concerns about the effects on river flow. Id.

The Corps requested that plaintiff respond to the comments within thirty days. Id. ¶ 26. On February 21, 2007, plaintiff responded in writing to the Corps. Id. ¶ 27. Despite the requests for information and the invitation to respond to the public comments, plaintiff's letter contained only a reiteration of his asserted right to fill the subject property as granted by the Easement Deed. Id. Plaintiff declined to conduct a hydraulic study on the impact that filling the subject property would have on the flow of the Arkansas River. Id. ¶ 30. In fact, plaintiff did not conduct any studies to support his plan to develop the subject property. Id. Nor did plaintiff consider any alternatives for developing the subject property, investigate the possibility of using the subject property as a mitigation bank, or consider any alternatives to his development plan. Id. ¶¶ 30, 31. Plaintiff steadfastly adhered to his belief that none of the foregoing actions were necessary, given the "right" to fill the property reserved in the Easement Deed. Id. ¶ 31. On February 23, 2007, after receiving plaintiff's letter, Tim Scott, a Senior Project Manager in the Corps's Little Rock District, telephoned plaintiff regarding the processing of his 404 permit application. Id. ¶ 28. During that conversation Mr. Scott informed plaintiff that he "'was just checking if [plaintiff] had any more response[s] before [he] made a final decision.'" Id. Mr. Scott further stated that he "'needed additional information but could go on with what [he] had'" if plaintiff chose not to provide anything else. Id. Plaintiff, however, was not informed that his permit application would be withdrawn based on his not providing information. Id. ¶ 29.

---

6/ According to the parties' Joint Stipulation, the Corps recommended that plaintiff hire a professional to complete a "hydraulic" study. Id. ¶ 25. This court is unsure whether the parties intended to convey that the Corps requested that plaintiff perform a "hydrologic" study on the potential effects of the fill material on the flow on the Arkansas river. The reason for the court's uncertainty is that "hydraulic" is used to mean "denoting, relating to, or operated by a liquid moving in a confined space under pressure," whereas "hydrology"—the adjectival form being "hydrologic," which was used by the USF&WS—means "the branch of science concerned with the properties of the earth's water, esp. its movement in relation to land." *New Oxford American Dictionary* 853-54 (3d ed. 2010). Although the court understands from the record that the Corps requested that plaintiff perform a hydrologic study, the court will use the terminology employed in the parties' Joint Stipulation.

On August 30, 2007, the Corps denied plaintiff's permit application, having determined that "'[i]nadaquate information was provided by [plaintiff] to thoroughly evaluate his project'"; thus, the Corps concluded that "'the fill activity does not comply with the Environmental Protection Agency's . . . Section 404[](b)(1) Guidelines.'"  Id. ¶ 32 (first alteration in original).  The Corps placed particular emphasis on the fact that plaintiff had refused to provide any support for his project by means of a hydraulic study or proposed alternatives.  The Corps reasoned that the "'placement of 230,000 cubic yards of fill within a designated floodway of a major navigable river, and within a high quality forested wetland, requires detailed information in order for the Corps to adequately evaluate the project.'"  Id.  However, plaintiff did not make "'any attempt to demonstrate that the project may or may not have any practicable alternatives which would have less adverse environmental impacts,'" and "'[n]o efforts [were] made by [plaintiff] to minimize or avoid impacts by reducing the project scope or building in adjacent uplands.'"  Id.  The Corps also commented on plaintiff's failure to provide any information regarding the project's effect on the floodplain, as required by FEMA and the City of North Little Rock.  Id.  Noting that plaintiff owned roughly "'30 acres of upland' which were 'available and practicable for heavy equipment storage,'" the Corps concluded that the project was not water-dependent and that plaintiff had not demonstrated any need for the project to be developed in the wetlands area of the subject property. 7/  Id.

Along with notification of the denial of the permit application, the Corps informed plaintiff that he had "'the opportunity to appeal this permit decision by filing a Request for Appeal (RFA) as described in the NAP [Notification of Appeals Process].'"  Id. ¶ 33.  Plaintiff elected to exercise this option and appealed the permit denial through the Corps's administrative appeal process.  Id. ¶ 34.  On April 15, 2008, the Corps informed plaintiff by letter that it had denied his appeal.  Id.  This denial represented the final Corps decision regarding plaintiff's 404 permit application, and, as a result of the issuance of the letter informing plaintiff that his appeal had been denied, the Corps deemed that plaintiff had exhausted all administrative remedies.  Id. ¶ 35; see also Mehaffy, 98 Fed. Cl. at 624.

---

7/  The Corps's denial of the permit application did nothing to prevent plaintiff from developing the northern uplands portion of the subject property, should he choose to do so.  Id. ¶ 41.

8

On December 14, 2009, plaintiff filed his complaint. 8/  Defendant answered on February 26, 2010, and this court entered a scheduling order on April 19, 2010.  After several unopposed motions to extend discovery, defendant unsuccessfully moved to dismiss for lack of ripeness.  See Mehaffy, 98 Fed. Cl. 604 (denying defendant's motion to dismiss, finding that final agency action on permit application had taken place and, thus, that Corps's decision was ripe for judicial review).  On September 2, 2011, the parties filed a Joint Stipulation of Facts, and on the same date, defendant moved for summary judgment.  Briefing was completed on October 24, 2011, followed by argument.

## DISCUSSION

I. Standards

### 1. Summary judgment in takings cases

Courts have the power to resolve legal issues in a case on summary judgment.  See Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  In takings cases generally, "[w]hether or not a taking has occurred is a question of law based on factual underpinnings." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  Given the *ad hoc* nature of takings inquiries, the relevant issues normally are fact issues that must be determined either on the entirety of a complete record or at trial.  See Whitney Benefits, Inc. v. United States, 752 F.2d 1554, 1560 (Fed. Cir. 1985).  For this reason courts should avoid "precipitous grants of summary judgment." Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983).  However, that this is a "takings case does not affect the availability of summary judgment when appropriate to the circumstances," Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996), because "[t]here . . . [are] just compensation cases in which the United States as the moving party is 'entitled to judgment as a matter of law,

---

8/  Subsequent to the filing of the complaint, both parties retained experts to survey and value the land both pre- and post the plaintiff's envisioned project.  See id. ¶¶ 37-52.  Both plaintiff's and defendant's appraisers agreed that the "highest and best use" of the subject property would be commercial development allowed under "C-3" zoning.  See Mehaffy's Response to Proposed Findings of Uncontroverted Fact, filed Oct. 6, 2011, Nos. 1-2.  Otherwise, the valuations arrived at by the two experts were at odds.  See Joint Stipl. ¶¶ 37-52.  Ruling on defendant's motion for summary judgment does not require the court to make findings on the parties' differing assumptions, valuations, or methodologies.

and where it is quite clear what the truth is . . . ,'" Yuba, 723 F.2d at 887 (quoting Sartor v. Ark. Natural Gas Corp., 321 U.S. 620, 627 (1944)).

   2. *Penn Central* regulatory takings claim framework

   The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In addition to taking property by physical occupation or invasion, a taking may occur where the Government regulates private property. Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). 9/ Although the Government certainly may regulate property without giving rise to a compensable taking, "if regulation goes 'too far' it will constitute a compensable taking." M & J Coal Co. v. United States, 47 F.3d 1148, 1153 (Fed. Cir. 1995) (quoting Pa. Coal, 260 U.S. at 415). Limits are placed on the Government's regulation of private property based on the recognition that, if "subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" Lucas v. S. C. Coastal Council, 505 U.S. 1003, 1014 (1992) (alterations in original) (quoting Pa. Coal, 260 U.S. at 415).

   Given that this court already ruled that plaintiff's claim is ripe for judicial review, the court now must determine if the regulation goes "too far." This issue requires a "'two-tiered' inquiry into the government act alleged to have constituted a taking." Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003). First, the court must consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists." Id.; see also M & J Coal, 47 F.3d at 1154 (analyzing whether "interest was a 'stick in the bundle of property rights' acquired by the owner"). According to the United States Supreme Court, "property" is not simply a physical object, but "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." United States v. Gen. Motors Corp., 323 U.S. 373, 377-78 (1945); accord Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002). By way of explanation, the Federal Circuit has stated that

   [w]e determine whether an asserted right is one of the rights in the bundle of sticks of property rights that inheres in a *res* by looking to "existing rules or understandings" and "background principles" derived from an independent source such as state, federal, or common law. These rights define the dimensions of the requisite property interest for purposes of establishing a takings claim.

_____

   9/ Plaintiff alleges a regulatory—rather than a physical—taking based on the Corps's denial of his section 404 permit application. See Compl. ¶ 23.

Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1376-77 (Fed. Cir. 2004) (citations omitted).  If a claimant is unable to prove that it held a protected property interest, the takings claim will fail.  Wyatt, 271 F.3d at 1096 (holding that "only persons with a valid property interest at the time of the taking are entitled to compensation").

After a plaintiff succeeds in meeting the first element, the court proceeds to the second prong of the inquiry and determines whether the Government's action "constitutes a compensable taking of that interest for a public purpose."  Chancellor Manor, 331 F.3d at 902 (citations omitted); see also M & J Coal, 47 F.3d at 1154.  This determination involves an analysis based on the factors that the Supreme Court established in the seminal case on regulatory takings, Penn Central Transportation Company v. City of New York, 438 U.S. 104, 124 (1978) ("Penn Central"), which include "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations . . . [and] the character of the governmental action."  As interpreted by the Federal Circuit, this evaluation requires

> that the court balance several pragmatic considerations in making its regulatory takings determination.  These considerations include: [1] the economic impact of the regulation on the claimant, [2] the extent to which the regulation interferes with the investment-backed expectations, and [3] the character of the Government action.

Fla. Rock Indus., Inc. v. U.S., 18 F.3d 1560, 1564 (Fed. Cir. 1994) (applying the Penn Central analysis in determining if denial of mining permit was compensable taking).  Penn Central tasks the court to engage in an *ad hoc* fact-specific inquiry into the particular circumstances of each case.  See Penn Central, 438 U.S. at 124.  The Supreme Court has held that at least the second prong of the Penn Central analysis can be dispositive on the issue of whether or not there is a compensable taking.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984) (resolving portion of regulatory takings claim by finding no compensable taking solely under reasonable investment-backed expectations element of Penn Central framework); see also Norman v. United States, 429 F.3d 1081, 1092-94 (Fed. Cir. 2005); Good v. United States, 189 F.3d 1355, 1363 (Fed. Cir. 1999).

## II.  Whether plaintiff has a compensable property interest

Defendant has advanced three arguments in support of its position that plaintiff lacks a compensable property interest.  See Def.'s Br. filed Sept. 2, 2011, at 13-17.  First, defendant contends that plaintiff is limited in his right to fill his property by the express restrictions located in the Easement Deed.  See id. at 14-15.  Because the language of the Easement Deed requires plaintiff to obtain the written approval of the Corps before filling

11

the property, the denial of the permit application constitutes a valid exercise of Corps authority. Second, defendant denies that plaintiff has a compensable property interest in this case because plaintiff's project is prohibited by local law due to his failure to comply with local ordinances governing the placement of fill in the Arkansas River. See id. at 15. Having chosen not to comply with the applicable local law, plaintiff cannot claim a compensable property interest based on a federal taking when the envisioned project was simultaneously blocked by local law. Third, defendant argues that any property interest held by plaintiff in the subject property is limited by the United States' navigational servitude. See id. at 16-17. The Government's special rights in the navigable waters of the United States curtail the scope of takings claims that can be asserted against the United States in cases such as this.

Plaintiff devotes considerable time attempting to counter these arguments. In his response brief, plaintiff attempts to deflect these arguments point by point. See Pl.'s Br. filed Oct. 6, 2011, at 7-18. First, plaintiff argues that—while the Easement Deed contains restricting language that limits the right to fill the subject property—this language does not comprehend the restraints of the CWA, which were enacted subsequent to the conveyance of the Easement Deed and therefore are not binding on the reservation in the deed. See id. at 7-11. Next, plaintiff contends that the relevant local law was passed subsequent to the fill reservation in the Easement Deed and thus is inapplicable to this case. See id. at 11. Further, plaintiff contends that a question of fact exists concerning whether or not the local ordinance even applies to plaintiff's proposed project, thereby rendering the issue inappropriate for resolution on summary judgment. See id. at 11-13. Plaintiff finally counters that the question of whether considerations of the United States' navigational servitude are triggered in this case is again premature, as these involve disputed contentions of fact that the court should resolve by trial, not on summary judgement. See id. at 14-17.

Without commenting on the merits of the parties' arguments, and despite the effort spent by the parties in briefing these issues, an inquiry into a compensable property interest is not an analytical prerequisite to ruling on defendant's motion. Given that the facts of this case implicate denial of a section 404 permit, applicable precedent instructs that the court evaluate the claim under the Penn Central factors. In Norman the United States Court of Appeals for the Federal Circuit stated that, "[i]n general, this court has analyzed takings claims arising from section 404 permit issues using the regulatory takings analysis set forth in Penn Central" unless there has been either a physical or categorical taking. 429 F.3d at 1088. This guidance means that in section 404 permit cases—in which the issue is almost always one of a regulatory taking—courts should proceed directly to the Penn Central factor analysis unless there has been a physical taking or a categorical (regulatory) taking such as that present in Lucas, 505 U.S. at 1006. See, e.g., Preseault v. United States, 100 F.3d 1525, 1540 (Fed. Cir. 1996) (finding that the "two quite different situations" of physical taking and regulatory taking "call for quite different analyses").

Neither party has put forward an argument that a physical taking is implicated, so that exception has not been triggered in this case.  Nor has there been any allegation of a categorical taking.  A categorical taking is "a regulatory taking in which government action deprives the landowner of all beneficial use of his property, such that the government action is the functional equivalent of a physical invasion." Norman, 429 F.3d at 1090.  Plaintiff has never alleged that the Government has deprived him of all beneficial use of his property. Therefore, based on the controlling precedent of Norman, this court proceeds to the analysis of the Penn Central factors.

III.  *Penn Central* analysis

Moving to the three-prong analysis laid out in Penn Central that serves as the core analytical framework for regulatory takings claims, the court determines whether defendant has established its entitlement to summary judgment.  As a preliminary matter, in response to plaintiff's overarching argument that summary judgment is not appropriate because of the fact-intensive nature of the Penn Central analysis, see Pl.'s Br. filed Oct. 6, 2011, at 18, controlling precedent establishes that summary judgment can be granted in regulatory takings cases.  Despite the fact that the Penn Central framework requires factual inquiries, the Federal Circuit has held that summary judgment is an appropriate disposition on a regulatory takings claim when no genuine issue of material fact is present and the plaintiff has failed to meet one of the three prongs of the Penn Central analysis.  See Good, 189 F.3d at 1363 (affirming grant of summary judgment for Government on plaintiff's regulatory takings claim on ground that, as a matter of law, plaintiff lacked reasonable investment-backed expectations).  Moreover, defendant need not satisfy all three prongs of the Penn Central test in order to prevail on a motion for summary judgment; indeed, a strong showing that plaintiff lacked reasonable investment-backed expectations is sufficient by itself for a determination that no taking has occurred.  See id. at 1360 ("Because we find the expectations factor dispositive, we will not further discuss the character of the government action or the economic impact of the regulation.").

Based on the following analysis, this court concludes that plaintiff is unable to establish the Penn Central factors in its favor as a matter of law.

1.  Economic impact of the regulation

The first inquiry under the Penn Central framework requires an examination of the economic impact of the relevant regulation.  This factor of the test is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994).  Unfortunately for courts, this factor, at best, contemplates an

imprecise analysis.  While the Supreme Court has stated that in applying this factor the court should "compare the value that has been taken from the property with the value that remains in the property,"  Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987), courts have not yet reached a consensus as to a particular, universally applicable percentage of diminution in value that establishes a taking.

Neither party disputes that the "highest and best use" of the subject property would be commercial development allowed under "C-3" zoning.  See Mehaffy's Response to Proposed Findings of Uncontroverted Fact, filed Oct. 6, 2011, Nos. 1-2.  However, the parties' valuations of the property are considerably divergent, and both parties have disputed what values are appropriate to include in their valuation methodologies.  See Joint Stipl. ¶¶ 37-52.  Given the genuine dispute on the value of the property, resolution of this prong is not appropriate for summary judgment.

## 2. Reasonable investment-backed expectations

The court next examines whether or not plaintiff had reasonable investment-backed expectations to fill the property.  This factor has been held to be crucially important in regulatory takings cases because it is "a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime."  Loveladies Harbor, 28 F.3d at 1177.  The logic behind this idea is straightforward: "One who buys with knowledge of a restraint assumes the risk of economic loss.  In such a case, the owner presumably paid a discounted price for the property.  Compensating him for a 'taking' would confer a windfall."  Creppel v. United States, 41 F.3d 627, 632 (Fed. Cir. 1994) (citations omitted).  For this reason, "although a takings claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction, it is particularly difficult to establish a reasonable investment-backed expectation" in those situations where the party had constructive or actual knowledge of the restriction.  Norman, 429 F.3d at 1092-93 (citations omitted) (internal quotation marks omitted).  Consequently, the court should consider a party's expectations "both at the time he purchased [the property] and at the time he began to develop it."  Good, 189 F.3d at 1360.  "[T]o hold otherwise would turn the Government into an involuntary guarantor of the property owner's gamble that he could develop the land as he wished despite the existing regulatory structure."  Forest Props., Inc. v. United States, 39 Fed. Cl. 56, 76-77 (1997) (citation omitted).

When analyzing this factor, the court must consider what a party's reasonable objective expectations were in the property; the party's subjective expectations for the property should not be considered.  See Chancellor Manor, 331 F.3d at 904 ("The subjective expectations of the [plaintiff] are irrelevant.  The critical question is what a reasonable owner

in the [plaintiff's] position should have anticipated." (citations omitted)).  It is well settled that "a reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need."  <u>Monsanto</u>, 467 U.S. at 1005-06 (citation omitted) (internal quotation marks omitted).  Indeed, property owners may not "establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development."  <u>Penn Central</u>, 438 U.S. at 130.

The court turns to the arguments presented by the parties in their respective briefs. Defendant lays out a host of factors weighing in its favor.  <u>See</u> Def.'s Br. filed Sept. 2, 2011, at 25; Def.'s Br. filed Oct. 24, 2011, at 12-13.  Beginning with the date on which plaintiff individually acquired possession of the subject property—May 9, 2000—defendant contends: (1) the regulatory regime at issue, the CWA, was not a new or unexpected legislative development, but had been in force for over twenty years; (2) plaintiff had received actual notice that the subject property and the reservation of the right to fill the property preserved in the Easement Deed were subject to the CWA and that a 404 permit would be required should he wish to fill the property, Joint Stipl. ¶ 11; (3) plaintiff had independent knowledge by way of his experience in the construction industry that a 404 permit was required in order to place fill material in wetlands, Mehaffy's Response to Proposed Findings of Uncontroverted Fact, filed on Oct. 6, 2011, No. 7; (4) plaintiff made no subsequent investments in order to develop the subject property such as seeking other required government permits, <u>see</u> Joint Stipl. ¶ 36; and (5) local law places several requirements on plaintiff that must be satisfied before the property can be filled, and plaintiff has not attempted to comply with any of them.  Taken together, these arguments establish that plaintiff was indeed on notice of the regulatory framework at issue when he took possession of the subject property, and, as noted in <u>Norman</u>, they sharpen plaintiff's challenge to establish that he had reasonable objective expectations of developing the property without being subjected to the CWA provisions.

Plaintiff's arguments in opposition primarily seek to readjust the relevant time period that should be considered in evaluating his arguments.  Plaintiff urges that the reasonableness of his expectations should be assessed at the time Judge Mehaffy negotiated the reservation of the right to place fill material on the subject property, rather than beginning with the date on which plaintiff took possession of the property.  <u>See</u> Pl.'s Br. filed Oct 6, 2011, at 21-22. Essentially, plaintiff argues as follows: Judge Mehaffy, the principal controller of Nomikano, intended to preserve the right to fill the subject property so that one day plaintiff could develop it to use in his construction business.  To this end Judge Mehaffy negotiated a reservation of the right to fill the property above 252 feet m.s.l. in the Easement Deed granted to the Government.  Because this transaction was completed before the CWA was passed, the only written permission required from the Corps was that the fill would not disturb the Arkansas River project.  Because Judge Mehaffy at that time might have had a reasonable

15

investment-backed expectation in developing the subject property consistent with the right to fill, this expectation, as it stood when the Easement Deed was created, has been transferred along the chain of title to plaintiff—current holder of the subject property—who thus reasonably believed he had the right to fill the property.  In light of controlling precedent, the court finds this reasoning unpersuasive.

First, as in <u>Norman</u>, plaintiff has failed to proffer a factual or legal justification to refer back to the 1960s for determining whether or not plaintiff had a reasonable investment-backed expectation in the mid-2000s.  Simply put, plaintiff "could not have had any investment-backed expectation in property in which [plaintiff] had not yet invested." <u>Norman</u>, 429 F.3d at 1092.  Thus, this court deems irrelevant the expectations Nomikano—the title holder of the subject property when the Easement Deed was negotiated—may have had and considers only the expectations that a reasonable person in plaintiff's position would have had upon acquiring the subject property in May 2000.

The implications of plaintiff's argument that property rights are frozen as of the date on which they were introduced into the title chain are startling.  If every property owner were allowed to rely on the date of a particular right's genesis in establishing whether or not federal or state regulations applied to the interest, takings jurisprudence would be limited to ascertaining that date and not to analyzing the impact of subsequent statutes or regulations on the property rights.  This position cannot be sustained.  Rights such as the one reserved in the Easement Deed are not immune from being subjected to more recent regulation—a fact that plaintiff himself does not dispute.  Pl.'s Br. filed Oct. 6, 2011, at 23.

Second, as per the guidance of the Federal Circuit in <u>Good</u>, this court is tasked with looking at what the reasonable expectations were both at the time the property was acquired and at the time the plaintiff began to develop it.  <u>See Good</u>, 189 F.3d at 1360; <u>see also id.</u> at 1363 ("While [plaintiff's] prolonged inaction does not bar his takings claim, it reduces his ability to fairly claim surprise when his permit application was denied.").  Even if plaintiff had acquired whatever right might have been created in 1970, this court would still evaluate his reasonable expectations when he applied for the permit in 2006; and, at the time that plaintiff actually applied for the permit, he had full knowledge of the requirements of the CWA.  Therefore, the unexpected regulatory change that usually characterizes a regulatory taking is absent.  This case would seem to be the prototypical non-takings case.  When plaintiff purchased the subject property in May 2000, he paid only $10.00.  Joint Stipl. ¶ 16.  If the court accepts as true that the price paid for the property includes the risk of being unable to develop the property as desired, then a compensation award in this case would result in a tremendous windfall to plaintiff.  As noted above, the Government is not, and should not be, "an involuntary guarantor of a property owner's gamble that he could develop the land as he wished despite the existing regulatory structure." <u>Forest Props.</u>, 39 Fed. Cl.

16

at 76-77.  In sum, it does not appear that, given the regulatory regime that existed at the time plaintiff applied for his 404 permit—a regime that had existed for more than twenty years—plaintiff has had anything taken from him unjustly.

Third, plaintiff's attempts to argue around the inconvenient fact that he had knowledge of the regulatory scheme of the CWA are unpersuasive.  Plaintiff has admitted that he had both actual and constructive knowledge not only of the permitting requirements under the CWA, but also of the application of those requirements to the subject property.  Pl.'s Br. filed Oct. 6, 2011, at 22-23.  This fact itself indicates that plaintiff "could not have [purchased the subject property] in reliance on a 'state of affairs' that did not include those restrictions."  Norman, 429 F.3d at 1093.  Attempting to recharacterize what has occurred, plaintiff seeks to avoid the ineluctable conclusion that a reasonable person would have appreciated that the CWA permitting requirements applied to any plans to develop the subject property.  In his opposition brief, plaintiff states that "[t]he 1980 letter does not advise Mehaffy that he no longer has the right to place any fill on his property . . . ."  Pl.'s Br. filed Oct. 6, 2011, at 22.  This statement is correct because—ignoring any issues of compliance with state or local law—the 1980 letter only informed plaintiff that his right to place fill on the subject property was subject to the regulations under the CWA.  In the next line of his brief, plaintiff argues that, although he knew of the permitting requirements and their application to the subject property, "he still reasonably thought he possessed the reserved right to fill and that the permit requirement was nothing more than 'some red tape to clear.'"  Id. at 23.

Plaintiff's argument ignores the fact that objective expectations govern, not whatever subjective ones that plaintiff may have had.  As the Supreme Court in Penn Central crystalized, property owners may not "establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available . . . ."  438 U.S. at 130.  Whether plaintiff considered that his position was deserving of more leniency in making a permit determination than that of another similarly situated person is irrelevant.  A reasonable, objective person who knew that the requirements of section 404 applied to his property could be expected to assume that the law would be applied to him in the same manner as to any other.

This hyperbole that all development rights have been extinguished by the Corps via the denial of plaintiff's section 404 permit application glosses over the facts of the case at bar.  While plaintiff may have expected the permitting process to be nothing more than "some red tape," it was his responsibility to take the permitting process seriously.  He did not.  The record demonstrates that plaintiff was, at best, uncooperative with the Corps, and to this day has not taken the steps of explaining why the wetlands portion of the subject property needs to be filled to effectuate his development plan or commissioning a survey to

17

demonstrate the effects of this action.  <u>See</u> <u>Mehaffy</u>, 98 Fed. Cl. at 609-10.  Given this obdurate behavior in the face of repeated requests for information, the Corps denied the fill permit.  This denial does not forever foreclose plaintiff from developing his property, nor does it effectuate the categorical taking that plaintiff implicitly argues.  Plaintiff is free to re-apply for the permit with the additional information requested by the Corps, and it is possible for him to change the outcome of the process through his own willingness to cooperate with regulatory authority that he himself acknowledges as serving a public purpose.  <u>See</u> Pl.'s Br. filed Oct. 6, 2011, at 23.  This is not a case where plaintiff has done everything possible in attempting to proceed with his development plan.  Other than making declarations that he is deserving, plaintiff has done little to advance his own cause.  Objectively speaking, given the knowledge of the regulatory regime at issue, plaintiff's reasonable investment-backed expectation was that the Corps would provide his permit application a fair hearing.  Of that, plaintiff was not deprived.

3.  <u>Character of the government action</u>

Finally, the court looks to the third <u>Penn Central</u> factor—the character of the government action.  This factor "requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition . . . ."  <u>Maritrans Inc. v. United States</u>, 342 F.3d 1344, 1356 (Fed. Cir. 2003).  According to the Supreme Court, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  <u>Penn Central</u>, 438 U.S. at 124 (citation omitted).  The Supreme Court has stated that, "while most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community, some are so substantial and unforeseeable . . . that justice and fairness require that they be borne by the public . . . ."  <u>Kirby Forest Indus., Inc. v. United States</u>, 467 U.S. 1, 14 (1984) (internal quotation marks omitted).  Extrapolating from the Supreme Court's analysis in <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 537 (1998), the Court of Federal Claims has considered two factors in particular as being relevant: "(i) the extent to which the action is retroactive; and (ii) whether the action targets a particular individual."  <u>Brace v. United States</u>, 72 Fed. Cl. 337, 356 (2006).

This case involves the denial of a section 404 permit—a regulatory mechanism under the CWA that is designed to protect and preserve the nation's wetlands.  Plaintiff expressly states that he is "not contending that the Corps lacks any rights to regulate wetlands . . . [nor] that preservation of wetlands is not a valid public purpose."  Pl.'s Br. filed Oct. 6, 2011, at 23.  In addition to there being an evident public benefit that plaintiff shares by being a member of the public, the facts at bar indicate that this permitting requirement did not

operate retroactively.  In acquiring the subject property in May 2000, plaintiff had both constructive and actual notice of the permitting requirements of the CWA and knew that those requirements applied to the subject property.  Further, the court does not find that the Corps's actions in this case were particularly directed at plaintiff.  As previously stated by the Court of Federal Claims, "the CWA and the wetlands regulations issued thereunder are generally applicable to all similarly situated property owners and can in no way be viewed as being directed at plaintiff[]."  Brace, 72 Fed. Cl. at 356.  Based on the facts presented, this court finds that this regulation does not go "too far" and specifically impose on plaintiff an unfair burden.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant has shown as a matter of fact and law that it is entitled to summary judgment in its favor pursuant to RCFC 56(a), and its motion is granted.  The Clerk of the Court shall enter judgment for defendant.

2.  Paragraphs 3-6 of the scheduling order entered on May 23, 2011, are vacated.

No costs.


/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge